864 F.2d 1026
 57 USLW 2418
 HYNSON, Jalee, a Minor, By and Through Her Grandparent and
Guardian, HYNSON, Jeffrie and Hynson, Charzell, a Minor, By
and Through His Grandparent and Guardian, Hynson, Jeffrie,
and Hynson, Jeffrie, Administratrix of the Estate of Hynson,
Alesia, Deceased, on Behalf of the Estate of Hynson, Alesia
and Hynson, Jeffrie, in Her Own Right
v.
The CITY OF CHESTER, LEGAL DEPARTMENT and Captain A. Joseph
Lastowka, Jr. and Officer Daniel Elder and Delaware County
Prison Board of Inspectors and Scotfoam, Inc., a Subsidiary
of General Felt Industries, Inc. and Allied Security, Inc.
and Brock International Security Corp. and Delaware County
Domestic Abuse Project Inc. and Wideman, Dolly L. and
Delaware County Legal Assistance Association, Inc. and
Noble, Suzanne, Esq.
Appeal of LASTOWKA and Elder.
 No. 88-1337.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 7, 1988.
Decided Dec. 23, 1988.
 
 Joseph Goldberg (argued), Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for appellants.
 A. Terry Daly (argued), Deborah Brand, A. Terry Daly, Ltd., Philadelphia, Pa., for appellees.
 Before HIGGINBOTHAM, MANSMANN, and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 At first blush, this appeal dealing with the denial of qualified immunity to defendant police officers for activity performed in the line of duty may appear to be but one of an unremarkable number of similar appeals. Instead, this case presents an issue exemplifying a growing trend of reliance on 42 U.S.C. Sec. 1983 to bring an action against the police alleging that the policies used in handling domestic abuse cases violate the equal protection of women victims.[1]
 
 
 2
 Here, the plaintiffs alleged that the officers pursued a policy of ignoring domestic abuse complaints and thereby violated the plaintiffs' decedent's right to equal protection of the laws by failing to arrest the former boyfriend of the decedent who subsequently killed her at her place of employment.
 
 
 3
 We have invariably recognized that police officers and other government officials performing discretionary functions possess a qualified immunity from suit which shields them so long as their actions could reasonably be thought to conform with the rights they are alleged to have violated. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Because the police policy or custom at issue here--that allegedly police officers treat domestic abuse victims differently than other victims of violent crimes--is not discriminatory toward women on its face, we must therefore apply the facially neutral policy analysis the Supreme Court first announced in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).
 
 
 4
 We conclude that a police officer loses a qualified immunity to a claim that a facially neutral policy is executed in a discriminatory manner only if a reasonable police officer would know that the policy has a discriminatory impact on women, that bias against women was a motivating factor behind the adoption of the policy, and, that there is no important public interest served by the adoption of the policy. We will remand to the district court for a determination consistent with our opinion.
 
 I. The Facts
 
 5
 Shortly after midnight on October 15, 1984, Alesia Hynson was shot and killed by her former boyfriend, Jamil Gandy, the father of one of her two children.[2] Prior to her death, Hynson had sought and obtained a temporary protection from abuse order,[3] which had expired.[4] Under Pennsylvania law, a defendant who violates a valid protection from abuse order can be arrested without a warrant and held in indirect criminal contempt. Pa.Stat.Ann., tit. 35 Sec. 10190 (Purdon 1988 Supp.).
 
 
 6
 On October 14, 1984, Ms. Hynson accompanied her sister and her cousin to an "after hours club" in the City of Chester, leaving her children with a babysitter. While at the club Hynson was approached and threatened by Gandy. After Gandy left the club, he went to Hynson's residence and broke a window, attempting to gain entry. Frightened, the babysitter called the police, but no one responded. (The photocopy of a page in the police log book indicates the presence of an incorrect address.) When the women returned from the club and heard of Gandy's attempted entry, Hynson's sister called the police.
 
 
 7
 Three officers responded to the call: the defendants, Captain Lastowka and Officer Elder, and another policeman, Sergeant Chess, no longer a defendant. The women explained that Gandy had attempted to enter the apartment and had threatened Ms. Hynson at the club. When Hynson mentioned the protection from abuse orders but could not produce a valid order, one of the officers radioed the police department to verify if one had been issued.[5] There is a factual dispute concerning what happened next. The police offers aver that they, learning that there was no current order, asked Ms. Hynson if she wished to accompany them to the club to identify Gandy and that she refused and expressed a desire to leave with her children. The plaintiffs aver that the police officers never made this request and if so, it would have been foolhardy and dangerous for her to have accompanied them.[6] The police remained until she had departed for her mother's residence. Approximately twenty hours later, Gandy went to Ms. Hynson's place of employment where he shot and killed her.
 
 
 8
 The plaintiffs, the decedent's mother and children, brought this Sec. 1983 claim seeking money damages against the City of Chester, the police department, individual officers and numerous other defendants not involved here, alleging that the defendants violated Hynson's rights to due process and equal protection of the laws.[7] The matter presently before us involves only the individual defendants Lastowka and Elder. The district court granted the police officers' motion for summary judgment on the due process claim based on a qualified immunity, but denied summary judgment for the officers on the equal protection claim. The police officers appeal from that portion of the district court's decision which denied them summary judgment on equal protection grounds.
 
 
 9
 Because this is an appeal from a denial of a motion for summary judgment on the basis of qualified immunity, we have jurisdiction to hear the appeal under the collateral order doctrine. In Mitchell v. Forsythe, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court noted that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. Sec. 1291 notwithstanding the absence of a final judgment." Because the qualified immunity is an "immunity from suit rather than a mere defense to liability," id. at 526, 105 S.Ct. at 2816 it is effectively lost if the case is permitted to go to trial. See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (recognizing a small class of district court actions which determine rights separate from and collateral to rights asserted in the suit which are too important to be denied review and too independent of the cause to require that appellate review be deferred until the entire case is adjudicated). See also Stoneking v. Bradford Area School District, 856 F.2d 594 (3d Cir.1988).
 
 
 10
 It is settled law that we review summary judgment appeals by applying the same test the district court would apply initially under Rule 56. Gans v. Mundy, 762 F.2d 338 (3d Cir.), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). "The requirement is that there be no genuine issue of material fact ... that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" summary judgment must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 II. Discussion
 A. Equal Protection Claim
 
 11
 Hynson[8] brings this claim under 42 U.S.C. Sec. 1983, which provides a recovery mechanism for the deprivation of a federal right by a person acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Since there is no dispute that the police officers were acting under color of state law, we turn to the nature of Hynson's constitutional claim.
 
 
 12
 Equal protection doctrine arose from the Fourteenth Amendment, whose original purpose was to protect black Americans from the reigning system of Jim Crow.[9] Consequently, equal protection doctrine most strongly protects identifiable racial and ethnic groups from legislative and administrative classifications based on race or ethnicity. Courts subject explicit racial or ethnic classifications to a scrutiny that is "strict in theory and fatal in fact". Similarly, explicit gender distinctions are subject to intermediate scrutiny. They must not perpetrate "archaic and stereotypical notions" or be analyzed by applying "traditional, often inaccurate, assumptions about the proper roles of men and women." Mississippi University for Women v. Hogan, 458 U.S. 718, 725, 726, 102 S.Ct. 3331, 3336, 3337, 73 L.Ed.2d 1090 (1982) (state run nursing college may not limit admission only to women). In addition, gender distinctions must serve important governmental objectives and must be substantially related to the achievement of those objectives, Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976) (state may not have lower drinking age for women than for men).
 
 
 13
 The seminal case dealing with the discriminatory application of a facially neutral law is Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), in which the Supreme Court invalidated a San Francisco ordinance banning the operation of laundries in wooden buildings without first obtaining a license from the board of supervisors. When it was demonstrated to the Court that all Chinese petitioners were denied a license while all but one non-Chinese petitioners were granted a license, the Court invalidated the ordinance because it was "applied and administered by public authority with an evil eye and an unequal hand...." Yick Wo, 118 U.S. at 373-74, 6 S.Ct. at 1073. See also Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("Sometimes a clear pattern ... emerges from the effect of the state action even when the governing legislation appears neutral on its face"); and, Hoots v. Commonwealth of Pa., 672 F.2d 1107 (3d Cir.1982) (requisite discriminatory purpose or intent can be inferred from an official action which bears more heavily on one race or class than another).
 
 
 14
 The case presently before us involves a claim that the City of Chester police officers engage in a custom, policy and practice of failing to respond to complaints made by females against males known to them.[10] In other words, Hynson argues that the police officers treat domestic abuse cases differently than non-domestic abuse cases. By failing to consider Alesia Hynson's complaint against her former boyfriend as seriously as they would consider the complaint of a female against an unknown assailant, Hynson contends, the police officers denied her the equal protection of the law which ultimately resulted in her tragic death.
 
 
 15
 Hynson's lawsuit reflects a growing trend of plaintiffs relying upon the due process and equal protection clauses, enforceable through Sec. 1983, to force police departments to provide women with the protection from domestic violence that police agencies are allegedly reluctant to give. One recent commentator has stated:
 
 
 16
 The police policy towards battered women can take a variety of forms, from an outright refusal to arrest batterers and to recognize domestic violence as a criminal matter, to a practice of giving domestic violence calls lower priority than non-domestic disputes. Sometimes police policy is explained in written manuals. Often it is not in writing, but is demonstrated by a pattern of police behavior that treats assaults by men against their wives less seriously than assaults by strangers ... The police non-arrest policy is most commonly justified by a belief in "family privacy", a doctrine dictating that the state should not intervene in domestic matters. [Footnotes omitted.]
 
 
 17
 Note, Battered Women and the Equal Protection Clause: Will the Constitution Help Them When the Police Won't?, 95 Yale L.J. 788, 790-91 (1986). It is obvious that lawsuits requesting injunctions and monetary awards for damages resulting from such policies will cause municipal and metropolitan police agencies to reconsider their policies toward domestic violence.
 
 
 18
 The Court of Appeals for the Tenth Circuit recently decided Watson v. Kansas City, 857 F.2d 690 (10th Cir.1988), where the plaintiff--a police officer's wife--produced evidence of numerous instances of abuse which were known to her husband's superiors who took no disciplinary action against him. Neither was he arrested when she pressed charges against him. The court considered the statistical evidence produced by the plaintiff in support of her allegation that nondomestic assault cases were more likely to lead to an arrest than domestic assault cases and concluded that the statistical evidence,[11] coupled with evidence that the officers received training in defusing domestic violence situations, was sufficient to demonstrate that a pattern of deliberate indifference might exist on the part of the police department. Watson, 857 F.2d at 696. The court reversed the summary judgment order against Watson, noting that "a jury could infer, based on this evidence, that the City and Police Department acted with a discriminatory motive in pursuing this policy, and that her injuries were a result of the policy." Id.
 
 
 19
 Along with her allegation of discrimination on the basis of her membership in the class of victims of domestic abuse, Watson also contended that she was denied police protection because of her sex. The court of appeals affirmed the district court's summary judgment against Watson because she failed to demonstrate that a policy discriminating against victims of domestic violence necessarily adversely affected women. Id. at 696-97. The court found that Watson had failed to show evidence of a discriminatory purpose behind the policy. Id., citing, Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (a plaintiff challenging a gender-based discrimination claim must show that the classification was adopted to purposefully discriminate against women).[12]
 
 
 20
 We also note Balistreri v. Pacifica Police Department, 855 F.2d 1421 (9th Cir.1988), in which the Court of Appeals for the Ninth Circuit acknowledged that certain evidence produced by the plaintiff was sufficient to suggest "an animus against abused women." The court of appeals then reversed the district court's dismissal of Balistreri's equal protection claim. Id. at 1427.
 
 
 21
 We find persuasive guidance in these opinions of the Courts of Appeals for the Ninth and Tenth Circuits. We agree with the Watson court that if the categories used by the police in administering the law are domestic violence and nondomestic violence, this is not sufficient to raise a claim for gender-based discrimination absent a showing of an intent, purpose or effect of discriminating against women. In order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.[13] See Watson, 857 F.2d at 694. This is the essence of the constitutional right which the plaintiffs must show was clearly established at the time of the alleged violation in order to negate the police officers' qualified immunity.
 
 B. Qualified Immunity
 
 22
 Because the defendants Elder and Lastowka are municipal police officers, we are faced with the issue of whether they possess a qualified immunity to Hynson's equal protection claim.[14] The defense of qualified immunity for government officials represents a compromise between the conflicting concerns of permitting the recovery of damages for vindication of constitutional rights caused by the abuse of public office and permitting government officers to perform discretionary functions without fear of harassing litigation. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Stoneking, 856 F.2d at 598. In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court noted that:
 
 
 23
 By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences.
 
 
 24
 457 U.S. at 819, 102 S.Ct. at 2378-79 (citations and footnotes omitted).
 
 
 25
 Our recent decision in Stoneking v. Bradford Area School District, 856 F.2d 594 (3d Cir.1988), concerned whether or not school officials were entitled to a qualified immunity from the lawsuit brought by a young female student who had allegedly been victimized by the band director. Recognizing that the school officials would have an immunity from liability for civil damages so long as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would know, we first addressed the nature of the right claimed before determining whether it was clearly established at the time of the conduct.
 
 
 26
 The reference to clearly established rights in Harlow and Stoneking means more than the broad right to equal protection which the district court below found to be the most clearly established right Ms. Hynson possessed. In Anderson v. Creighton, the Supreme Court noted that a right is not clearly established unless it has been recognized in similar or analogous circumstances, i.e., "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the law." 107 S.Ct. at 3039. It is not enough to address the plaintiffs' equal protection claim in the broad sense as was done in the district court, but we must focus on Hynson's particularized right of not being subjected to a police policy of providing less protection to victims of domestic violence where the policy was developed or enforced with an intent to discriminate against women.
 
 
 27
 Applying Harlow and Anderson to the situation before us, and in light of the particularized right discussed above, we conclude that a police officer loses a qualified immunity to a claim that a facially neutral policy is executed in a discriminatory manner only if a reasonable police officer would know that the policy has a discriminatory impact on women, that bias against women was a motivating factor behind the adoption of the policy, and that there is no important public interest served by the adoption of the policy. This standard is the result of a careful balance between the plaintiff's right to pursue his or her claim that a statutorily or constitutionally protected right was violated by a public authority administering or applying an otherwise neutral policy with "an unequal hand" and the individual public official's right to perform his duties without a constant fear of harassing litigation.
 
 
 28
 If the plaintiffs are successful in proving the existence of a discriminatory policy, or a facially neutral policy applied with discriminatory intent, the individual police officers will nevertheless possess a qualified immunity if they can demonstrate that a reasonable police officer executing the policy could not have known that the conduct violated Ms. Hynson's clearly established right to equal protection.
 
 
 29
 We realize that perhaps for the first time in a published opinion we have articulated a standard for the district courts in this circuit to follow in the Sec. 1983 cases arising from domestic violence situations. Therefore, because neither the district court nor the parties had the benefit of our standard at the time of the decision below, we will vacate the order denying summary judgment on the equal protection issue and remand for further proceedings consistent with our opinion. The plaintiffs have requested an opportunity to amend their complaint to comply with our standard. This motion should be placed before the district court on remand. We also leave to the discretion of the district court the question of whether further discovery, if necessary or appropriate, should be granted.
 
 
 
 [1]
 E.g., Watson v. Kansas City, 857 F.2d 690 (10th Cir.1988) (nondomestic abuse cases were more likely to lead to arrest than domestic abuse cases reflecting a policy of indifference from which intentional discrimination could be inferred); Balistreri v. Pacifica Police Dept., 855 F.2d 1421 (9th Cir.1988) (showing of animus toward abused women could support equal protection claim); and Dudosh v. City of Allentown, 665 F.Supp. 381, rehg. denied sub nom., Dudosh v. Warg, 668 F.Supp. 944 (E.D.Pa.1987), vacated & rem'd, Dudosh v. City of Allentown, 853 F.2d 917 (unpublished opinion 3d Cir.1988); Thurman v. City of Torrington, 595 F.Supp. 1521 (D.Conn.1984); Sherrell By and Through Wooden v. City of Longview, 683 F.Supp. 1108 (E.D.Tex.1987) (child's claim that police failed to arrest abuser because he was a police officer reflected a policy of treating police officers involved in domestic disputes differently than citizens and violated child's Sec. 1983 rights)
 
 
 [2]
 Since we hear this case on an appeal from the denial of a motion for summary judgment, we look at the facts in a light most favorable to the nonmoving party. Gans v. Mundy, 762 F.2d 338 (3d Cir.), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985)
 
 
 [3]
 Protection From Abuse Act, Pa.Stat.Ann., tit. 35 Sec. 10181 et seq. Section 10184 provides in pertinent part: "(a) A person may seek relief under this act for himself or herself, or any parent or adult household member may seek relief under this act on behalf of minor children by filing a petition with the court alleging abuse by the defendant."
 
 
 [4]
 Alesia Hynson had obtained several protective orders; one for August 17 to August 25, 1983 and another for the period of September 7, 1983 to September 7, 1984. Her most recent order, obtained October 4, 1984, expired on the day of the hearing, October 11, 1984, where she sought another one year protective order. This more permanent order was signed October 16, 1984, the day following Hynson's death
 
 
 [5]
 Pa.Stat.Ann., tit. 35 Sec. 10190 provides: "(c) ... The police officer may verify, if necessary, the existence of a protection order by telephone or radio communication with the appropriate police department."
 
 
 [6]
 The police further aver that they also asked Hynson to file a criminal complaint. The plaintiffs allege, conversely, that the police never asked the deceased to file a complaint and that she would have had she been asked
 
 
 [7]
 Indeed, in Hynson v. City of Chester, 827 F.2d 932 (3d Cir.1987) ("Hynson I "), the plaintiffs claimed that the warden had failed to provide a mechanism for the immediate apprehension of prisoners who failed to report for weekend sentences, thus violating her due process and equal protection rights. The deceased's former boyfriend was to have reported to prison at 5:00 p.m. on October 14, 1984. Approximately seven hours later, he killed her at her place of employment. We held that a county prison warden and prison officials were entitled to a qualified immunity to a claim that they had violated the deceased's constitutional rights where there was no showing on plaintiffs' part that the rights were clearly established at the time of the conduct
 
 
 [8]
 The numerous plaintiffs are collectively referred to as "Hynson" for ease of identification
 
 
 [9]
 As the Supreme Court stated in the Slaughter House Cases, 83 U.S. (16 Wall.) 36, 71, 21 L.Ed. 394 (1873):
 We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on the most casual examination of the language of these [the fourteenth and fifteenth] amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him.
 
 
 [10]
 Specifically paragraph 108 of the plaintiffs' second amended complaint alleges:
 Defendant Officers Elder, Lastowka, Chess ... and "John Doe," representing the individual members of the Chester Police Department engaged in a custom, policy and/or practice of failing to properly respond to or act upon complaints of assault and/or abuse made by female United States citizens, when said complaints are made to police officers or civilian employees of the Chester Police Department, and when said complaints are made against men who are either husbands of said females or who have close personal relationships with said females, despite Defendants' duty under law to act upon and/or properly respond to said complaints.
 Notwithstanding the allegations of the complaint it was made clear at oral argument before us that plaintiffs were not contending that a domestic complaint to the police from a male against a female would be treated differently from a domestic complaint by a female against a male.
 
 
 [11]
 The plaintiff presented evidence that of 608 nondomestic assault cases in Kansas City during the period of January 1, 1983 to September 8, 1983 there were 186 arrests (31%). Of 369 domestic assaults there were 69 arrests (16%). Watson, 857 F.2d at 695
 
 
 [12]
 Two of the justices concurring in Feeney noted that a large number of male nonveterans were affected by the Act, a situation not present in the case now before us. The reasoning of Justice Stevens joined in by Justice White, suggests that if one can infer an absence of discriminatory intent from impact on both sexes, then one can infer discriminatory intent from disparate impact. See Feeney, 442 U.S. at 281, 99 S.Ct. at 2297 (Stevens, J., joined by White, J., concurring)
 
 
 [13]
 We enunciate the standard for plaintiffs' prima facie case in order to eliminate the all too common shotgun pleading approach to these equal protection claims. We also note our decisions in Rotolo v. Borough of Charleroi, 532 F.2d 920 (3d Cir.1976), where we cautioned that "[i]n this circuit, plaintiffs in civil rights cases are required to plead facts with specificity," and, Frazier v. Southeastern Pa. Transp. Auth., 785 F.2d 65 (3d Cir.1986), where we noted that the specificity requirement had a twofold purpose: 1) to weed out at an early stage frivolous claims and those that should be heard in state court, and 2) to provide the defendant with sufficient notice of the claims asserted
 
 
 [14]
 The district court did find that the officers had a qualified immunity defense to the plaintiffs' due process claim, noting that the concept of special relationship upon which the due process claim is based was not fully developed at the time of Ms. Hynson's death. One of the first cases dealing with the issue of a due process violation was Thurman v. City of Torrington, 595 F.Supp. 1521 (D.Conn.1984), decided eight days after Hynson's death. This issue is not before us and we obviously take no position regarding it