Xiong Xeng MOUA; Kenneth Chee Lee; Nhia Vue; Mee Vang Moua; Yee Moua; Bee Moua, by his guardian ad litem, Mee Vang Moua; Joseph Moua, by his guardian ad litem, Mee Vang Moua; and Dia Moua, by her guardian ad litem, Mee Vang Moua, Plaintiffs,

v.

CITY OF CHICO; Chico City Council; Chico Police Department; Dan Herbert; Maureen Kirk; Steve Bertagna; Dan Nguyen–Tan; Coleen Jarvis; Scott Gruendl; Larry Wahl; Bruce Hagerty; Michael Nelson; Chad Keichler; Stratton & Kerch, Inc., a California corporation; Richard Shorkey; and Catherine Shorkey, Defendants.

No. CIV–S–02–0923DFL/KJM.

United States District Court, E.D. California.

April 9, 2004.

Ilene Janet Jacobs, California Rural Legal Assistance, Marysville, CA, for Plaintiffs.

Bruce Alan Kilday, Esq., Samantha R. Guild, Esq., Angelo Kilday and Kilduff,

Sacramento, CA, Chad Keichler, Chico, CA, Larry L. Hill, Esq., Nisson Pincin Sinclair Hill and Perrine, Redding, CA, for Defendants.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

The central issue in this case is whether the Equal Protection Clause requires a police department to provide an interpreter for any non-English-speaking victim of a crime who seeks police assistance. The plaintiffs in this case are Chico residents of Hmong ancestry who speak Hmong as their primary language and have limited proficiency in English.[1] Invoking the Equal Protection Clause, they seek to compel the City of Chico to provide interpretation services to translate between Chico law enforcement officers and Hmong residents with limited English proficiency. In our diverse nation, such a result would have far-reaching implications as to what is required of local governments in the provision of municipal services.

Plaintiffs bring claims against the municipal defendants under 42 U.S.C. § 1983, the Fair Housing Act ("FHA"), the California Fair Employment and Housing Act ("FEHA"), and for a writ of mandate to enforce California Government Code § 11135.[2] Plaintiffs also bring suit against Chad Keichler ("Keichler") for violations of the FHA, FEHA, the California Ralph Civil Rights Act, Civ.Code § 51.7, the Cali-

fornia Bane Civil Rights Act, Civ.Code § 52.1, and for assault and battery. The municipal defendants now move for summary judgment on all of plaintiffs' claims. Plaintiffs move for partial summary judgment against Keichler on their claims against him. For the reasons that follow, the court grants summary judgment to the municipal defendants on all of plaintiffs' claims. With the agreement of all parties, the court stays its consideration of plaintiffs' partial summary judgment motion on their claims against Keichler until the state criminal proceedings against him are completed.

### I.

This case arises out of an altercation between plaintiffs Xiong Xeng Moua, Kenneth Chee Lee, and Nhia Vue and defendant Chad Keichler on the evening of May 23, 2001. (Defs.' Mot. at 2; Pls.' Mot. at 2.) Moua, Moua's family, Lee, and Vue are all of Hmong ancestry and speak Hmong as their primary language; however, Moua's son Yee and Lee each speak some amount of English. (Defs.' Mot. at 2–3.) At about 9:00 p.m., Moua, Lee, and Vue pulled into the driveway of Moua's apartment complex, the Orchard Court apartments, having just returned from a daylong fishing trip. (Id. at 2.) Keichler was there when they arrived. A fight broke out between Keichler and the three others. Plaintiffs contend that Keichler started the fight by physically and verbally attacking them, and this contention has not been

---

1. Plaintiffs in this case are: Xiong Xeng Moua ("Moua"), his wife Mee Vang Moua ("Mrs. Moua"), their son Yee Moua ("Yee"), their son Bee Moua ("Bee"), their son Peter Moua ("Peter"), their son Joseph Moua ("Joseph"), their daughter Dia Moua ("Dia"), Moua's friend Kenneth Chee Lee ("Lee"), and Moua's friend Nhia Vue ("Vue").

2. The "municipal defendants" are the City of Chico, the Chico City Council, the Mayor of Chico (Maureen Kirk) and Chico City Coun-

cil's members (Vice Mayor Colleen Jarvis, Steve Bertagna, Dan Nguyen–Tan, Scott Gruendl, Larry Wahl, and Dan Herbert) in their official capacities, the Chico Police Department, Chico Chief of Police Bruce Hagerty ("Hagerty") in his official capacity, and Officer Michael Nelson ("Nelson") in his individual capacity (collectively, "the municipal defendants"). (Pls.' Opp'n at 27.) There are various other defendants who are not involved in these motions.

contested by the municipal defendants. (Pls.' Mot. at 2.) Keichler apparently yelled profanities and racist statements[3] at Moua, Lee, and Vue, and he inflicted injuries on all three of them, including knocking Moua unconscious. (*Id.;* Defs.' Mot. at 3.) Moua's son Peter dialed 911 to report the fight, and Officer Michael Nelson was sent to the scene. (Defs.' Mot. at 2.) Although other officers arrived soon after Nelson (*id.*), Nelson's conduct is the focus of plaintiffs' complaint.

The entire interchange between Officer Nelson, Lee, Vue, Moua, and Yee Moua is unclear, but the basic facts are not disputed. Moua was unconscious at this time and so could not interact with Nelson. (*Id.* at 3.) Vue speaks almost no English and thus did not speak directly with Nelson. (*Id.* at 2.) Kenneth Lee and Yee Moua dealt with Officer Nelson. According to Lee, Nelson asked him what had taken place, and Lee explained the facts to him. Lee spoke to Nelson in English and has testified that he understood Nelson and thought that Nelson could understand him.[4] Neither Lee nor any other plaintiff asked for an interpreter. (*Id.;* Defs.' Reply at 3.) Lee apparently acted as interpreter for his friends in speaking with Nelson. For example, Lee told Vue that Nelson needed to see his identification, and Vue gave it to Lee. (Defs.' Mot. at 2–3.) Yee Moua gave Nelson his father's driver's license and contact information. (*Id.* at 3.) Yee was almost 19 years old at the time of the incident and had interpreted for his parents since turning 18. (*Id.*)

Based on the facts he elicited from the Mouas, Lee, and Vue, Officer Nelson arrested Keichler. Keichler was later charged with public intoxication for the May 23 incident. (Pls.' Mot. at 2.) Despite the arrest and pending charge, over the course of the next three weeks, Keichler repeatedly returned to the Orchard Court apartments and engaged in threatening behavior toward the Mouas. On May 26, 2001, he again yelled profanities and racial epithets at the Mouas and threatened to kill Moua. The Mouas called the police, but Keichler had already left when the police arrived. (*Id.*) On May 27, 2001, Keichler returned and threw a bottle at the Mouas' front door. The Mouas did not call the police on that occasion. (*Id.;* Defs.' Mot. at 3.) On that same day, Officer Nelson returned to Orchard Court to follow up on the original incident and the subsequent encounters between Keichler and the Moua family. He met with Salvatore Randello, Orchard Court's property manager, who told Nelson that Keichler was staying in another tenant's apartment in violation of the lease and was no longer welcome on the property. Nelson offered to tell Keichler and his hosts of these facts, but Randello said he would do it himself. (Defs.' Mot. at 3–4.)

Keichler again returned on May 30, 2001 with some companions and engaged in intimidating behavior toward the Mouas. (Pls.' Mot. at 2.) Moua had his son Yee call the police department and initially was told that a patrol car would respond. However, the police dispatcher called back a few minutes later. The precise exchange between Yee Moua and the dispatcher is disputed. But it is undisputed that the dispatcher told the Mouas to call back if Keichler began causing a problem so that a patrol car could be sent at that time. (Pls.' Resp. to Defs.' SUF ¶¶ 42–45; Defs.' Mot. at 4.) Keichler returned to Orchard Court on May 31, June 1, June 8, June 11, and June 14, 2001. (Pls.' Mot. at 2–3.) On

---

**3.** E.g., "Fucking Vietnamese, Chinese, Cambodian," "I will beat you three Vietnamese, Chinese," "I'll send you back where you came from." (Pls.' Mot. at 2.)

**4.** In his deposition, Lee said, "I think he understand me but he doesn't—he didn't pay a lot of attention to my concern or question." (Lee Dep. at 54:2–7.)

some of these occasions, Keichler engaged in threatening behavior toward the Mouas, such as throwing beer bottles and walking toward Moua while pointing his finger at him. (*Id.*) However, on none of these occasions did the Mouas call the police. (Defs.' Mot. at 4.)

Sometime after these events, members of the Hmong community in Chico asked the Chico Police Department to take further action against Keichler in addition to the public intoxication charge. The Chico police interviewed the Mouas, Lee, and Vue again, this time with interpreters present. The police then forwarded the information to the Butte County District Attorney's office with a recommendation that felony assault and battery, criminal civil rights violations, and hate crime charges be filed. The District Attorney charged Keichler accordingly.[5] (Pls.' Opp'n at 1; Defs.' Mot. at 23.) These charges are still pending in state court.

Plaintiffs assert that because the defendants did not provide a Hmong interpreter, Officer Nelson's investigation was inadequate with the result that Keichler was not prosecuted as soon as he should have been following the May 23, 2001 incident. Plaintiffs claim that the municipal defendants violated the Equal Protection Clause of the Fourteenth Amendment by failing to provide interpretation services during the investigation of Keichler's behavior and by failing promptly to charge Keichler with a hate crime. They claim that these failures amount to a denial of equal access to police services on the basis of language

and race or ethnicity. Under the FHA and FEHA, plaintiffs claim that this unequal provision or outright denial of police services violated their right to fair housing free from racial or ethnic discrimination under 42 U.S.C. §§ 3604(a)-(b) & 3617 and Gov't Code §§ 12927(c), 12955(a), 12955(k), & 12955.7. Finally, under Gov't Code § 11135, which prohibits discrimination by municipalities that receive money from the state, plaintiffs claim that the municipal defendants have violated the non-discrimination conditions imposed by that section and seek a state law writ of mandate to enforce those conditions. Plaintiffs seek compensatory damages, declaratory and injunctive relief, and attorney's fees.

## II.

The municipal defendants move for summary judgment on all of plaintiffs' claims. As to the § 1983 claim, the municipal defendants contend that (1) plaintiffs do not have a constitutional right to police-provided interpreters; (2) there is no municipal policy or custom that violates plaintiffs' constitutional rights; and (3) Officer Nelson is entitled to qualified immunity. On the FHA and FEHA claims, the municipal defendants argue that plaintiffs' rights under these statutes to fair housing are not implicated because (1) the Mouas have not moved out of their dwelling; (2) the municipal defendants did not discriminate against the Mouas in the provision of municipal services or interfere with their right to housing; and (3) Lee and Vue never lived in Orchard Court.[6]

---

**5.** It is not clear from the record how much time elapsed between the events of May–June 2001 and the filing of felony charges against Keichler in state court. However, plaintiffs filed their complaint in this case on April 30, 2002. Thus, the time interval must have been no longer than 10 months.

**6.** In their opening brief (Defs.' Mot. at 20), the municipal City Council defendants claim

absolute legislative immunity from a § 1983 claim under *Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). However, as plaintiffs point out (Pls.' Opp'n at 20–22), municipal officials may only claim absolute immunity when they are sued in their individual capacities. When, as here, they are sued in their official capacities, any judgment for damages will run against the municipality that employs them. As the Su-

*A. Plaintiffs' § 1983 Equal Protection Claim*

■ Plaintiffs claim that the municipal defendants' failure to provide interpreters to translate between Officer Nelson and Moua, Lee, and Vue, and the consequent failure promptly to charge Keichler with a hate crime, deprived them of their right under the Fourteenth Amendment's Equal Protection Clause to be free from racial or ethnic discrimination in the provision of police services and protection.[7] In order to make out an equal protection violation, plaintiffs must prove four elements: (1) the municipal defendants treated them differently from others similarly situated; (2) this unequal treatment was based on an impermissible classification; (3) the municipal defendants acted with discriminatory intent in applying this classification; and (4) plaintiffs suffered injury as a result of the discriminatory classification. The municipal defendants' summary judgment motion raises two critical issues underlying plaintiffs' equal protection claim: (1) whether a failure to provide Hmong language interpreter services is tantamount to a failure to provide police service to persons of Hmong ancestry, and (2) whether the municipal defendants acted with discriminatory intent in failing to more quickly file felony charges against Keichler.

*1. Does Failure to Provide Hmong Language Services Amount to Discrimination Based Upon a Suspect Classification?*

■ As long as a municipal policy or practice distinguishes among people for reasons other than race, ethnicity, national origin, or gender and does not burden the enjoyment of a fundamental right, it will be upheld against an equal protection challenge if it is rationally related to a legitimate governmental interest. *See Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–314, 96 S.Ct. 2562, 2566–2567, 49 L.Ed.2d 520 (1976). Strict or intermediate review applies to classifications based on race, ethnicity, national origin, and gender. However, no court has ever held that strict scrutiny is triggered by a municipality's decision not to provide interpreters for all non-English-speaking residents in the City's provision of services. Yet that is precisely plaintiffs' claim; they assert that because language is so closely allied to ethnicity, the failure to provide a Hmong language interpreter in all police contexts is the equivalent of refusing to provide police services to a group of persons based on their national origin, race, or ethnicity.

The relatively few cases that have discussed language as a proxy for race or ethnicity in the equal protection context have distinguished between governmental activities that target or isolate a particular language group and those that simply offer municipal programs or services in English and not in other languages.[8] While there

preme Court noted in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978), "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent ..."

**7.** In footnote 3 of its opinion in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 1004 n. 3, 103 L.Ed.2d 249 (1989), the Supreme Court recognized that "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."

**8.** *See, e.g., Hernandez v. New York,* 500 U.S. 352, 371–372 111 S.Ct. 1859, 1872–1873, 114 L.Ed.2d 395 (1991) (prosecutor's peremptory challenges of Spanish-speaking jurors may be a pretext for racial or ethnic discrimination); *Olagues v. Russoniello,* 797 F.2d 1511, 1520–1521 (9th Cir.1986) (en banc) (holding that U.S. Attorney's vote fraud investigation that targeted recently registered, foreign-born voters who requested bilingual ballots in Spanish or Chinese was subject to strict scrutiny in an equal protection challenge because it amount-

is some authority that singling out speakers of a particular language merits strict scrutiny, no case has held that the provision of services in the English language amounts to discrimination against non-English speakers based on ethnicity or national origin. Were the government to target a particular language group for differential treatment, the inference might be drawn that the intended target is the racial or ethnic group closely associated with that language group. But the facts and allegations here do not involve the singling out of one language group for a denial of interpreter services or the scrutiny or compulsion of persons speaking a particular language. And while it might be a laudable goal for cities to provide interpreters for all language groups in the provision of all services, the practical ability to meet that goal in a diverse nation in an era of limited public funds may be doubted. Nor ought the Equal Protection Clause to dictate budget priorities by elevating language services over all other competing needs. Cf. Frontera v. Sindell, 522 F.2d 1215, 1219 (6th Cir.1975) (elaborating on the real-world consequences that would follow from such a view of equal protection doctrine).

Plaintiffs rely on Olagues v. Russoniello, 797 F.2d 1511, 1520–1521 (9th Cir.1986) (en banc), in support of their argument that the municipal defendants' actions in this case amount to ethnic discrimination. In Olagues, the Ninth Circuit ruled that a U.S. Attorney's vote fraud investigation targeting recently registered, foreign-born voters who requested bilingual ballots in Spanish or Chinese constituted ethnic discrimination against voters of Hispanic or Chinese ethnicity.[9] However, Olagues actually undermines plaintiffs' position here because of the fundamentally different factual circumstances in that case. In Olagues, the court thought it "clear that the [U.S. Attorney's] investigation targeted Chinese and Hispanic immigrants." Id. at 1521. The court found that the ostensible focus of the criminal investigation on speakers of Spanish and Chinese was a pretext for investigating persons of Hispanic and Chinese ethnicity. The Olagues court expressly distinguished those cases holding that government actions "involv[ing] a general classification of English-speaking versus non-English-speaking individuals" did not amount to ethnic discrimination under the Equal Protection Clause. Id. The Ninth Circuit thus recognized that government actions—like those of the municipal defendants in this case—that have the effect of treating non-English speakers differently from English speakers do not have a tendency to target or isolate any particular language, hence ethnic, group and thus do not serve as a pretext for ethnic discrimination.[10]

---

ed to ethnic discrimination), vacated as moot, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987); Soberal–Perez v. Heckler, 717 F.2d 36, 41–43 (2d Cir.1983) (holding that federal government's policy of providing written forms and oral instructions to applicants for Social Security disability benefits only in English did not amount to unconstitutional racial or ethnic discrimination against Hispanic applicants with limited English proficiency); Frontera v. Sindell, 522 F.2d 1215 (6th Cir. 1975) (holding that conducting civil service examination only in English did not amount to racial or ethnic discrimination against Hispanic exam taker with limited English proficiency, and that rational basis review was appropriate level of scrutiny to apply in an equal protection challenge).

9. The Supreme Court subsequently vacated the Ninth Circuit's en banc opinion in Olagues on mootness grounds. See Russoniello v. Olagues, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987).

10. Plaintiffs also rely on Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), in which the Supreme Court ruled that San Francisco's public school system must provide bilingual education to Chinese-speaking students with limited English proficiency. However, the Lau Court based its holding exclusively on Title VI of the Civil Rights Act

The facts of this case are quite similar to *Soberal–Perez v. Heckler,* 717 F.2d 36, 41–43 (2d Cir.1983), one of the cases expressly distinguished by the Ninth Circuit in *Olagues.* In *Soberal–Perez,* the Second Circuit held that the federal government's practice of providing application forms and oral instructions to applicants for Social Security disability benefits exclusively in English does not amount to ethnic discrimination against Hispanic applicants and passes muster under the equal protection component of the Fifth Amendment's Due Process Clause as long as rationally related to a legitimate governmental purpose. The facts of this case similarly involve the provision of a government service in English and a contention that this practice alone amounts to unconstitutional discrimination against members of any non-English-speaking ethnic minority. As the Second Circuit held in *Soberal–Perez,* this type of situation does not support an inference of racial or ethnic discrimination and does not implicate the concerns addressed by the Equal Protection Clause as long as the government's practice is rationally related to a legitimate governmental interest.

Since the municipal defendants' practice regarding interpreter services for non-English-speaking Hmong crime victims does not amount to ethnic discrimination against Hmong individuals, it is not subject to strict scrutiny. Rather, it will satisfy equal protection principles if it is rationally related to a legitimate gov-

ernmental purpose. Even if the Chico Police Department did not provide any interpretation services and Chico police officers spoke only English in their interactions with the public, this would satisfy rational basis review because of the dominant position of the English language in public affairs. *Cf. Soberal–Perez,* 717 F.2d at 42–43 (dominant role of English in our national affairs provides a rational basis for federal government's provision of application forms for Social Security disability benefits exclusively in English). However, the Chico Police Department employs a Community Service Officer who is fluent in Hmong to translate for Hmong residents of Chico who have limited proficiency in English. Plaintiffs fail to come forward with facts demonstrating that the resources the municipal defendants have devoted to Hmong interpretation services are not rationally related to Chico's legitimate governmental interest in providing municipal services to its residents on the most efficient and cost-effective basis.

### 2. Can Discriminatory Intent Be Inferred From a Delay in Filing Certain Charges?

Alternatively, plaintiffs claim that discriminatory intent can be inferred from the municipal defendants' failure to promptly prosecute Keichler for hate crimes.

The courts of appeals have addressed equal protection claims regarding alleged unequal provision of police services in an analogous line of cases.[11] The typical fact

of 1964, 42 U.S.C. § 2000d *et seq.,* and regulations promulgated thereunder. It expressly did not reach the Equal Protection Clause arguments put forward by the plaintiffs in that case; *Lau* is thus inapposite to plaintiffs' equal protection arguments in this case.

**11.** *See Navarro v. Block,* 72 F.3d 712 (9th Cir.1995); *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696 (9th Cir.1988); *Watson v. City of Kansas City, Kan.,* 857 F.2d 690 (10th Cir.

1988); *Hynson v. City of Chester, Legal Dep't,* 864 F.2d 1026 (3d Cir.1988); *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir.1990); *McKee v. City of Rockwall,* 877 F.2d 409 (5th Cir. 1989); *Shipp v. McMahon,* 234 F.3d 907 (5th Cir.2000), *overruled on other grounds by McClendon v. City of Columbia,* 305 F.3d 314 (5th Cir.2002); *Eagleston v. Guido,* 41 F.3d 865 (2d Cir.1994); *Soto v. Flores,* 103 F.3d 1056 (1st Cir.1997); *Hayden v. Grayson,* 134

pattern in these cases involves domestic violence and repeated calls for police intervention by a female victim. The plaintiffs in these cases assert that because of gender discrimination the police provide less protection to victims of domestic violence than to victims of non-domestic violence in violation of the Equal Protection Clause.

 In most cases of this type summary judgment is granted to municipal defendants based on plaintiffs' inability to submit sufficient evidence of discriminatory intent. In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court articulated exactly what a showing of discriminatory intent means in the equal protection context: "[I]t [is] not enough to prove that a policy maker could foresee the discriminatory consequences of his decision: 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Navarro*, 72 F.3d at 716 n. 5 (quoting *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296).

Applying this standard in police failure-to-serve cases, the courts consistently have required more evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving minority victims. Rather, the courts have required a showing of a pattern of failure to provide an adequate police response to minority complainants or direct evidence of racial disparagement among police officers. *See Navarro v. Block*, 72 F.3d 712, 715–717 (9th Cir.1995) (without more, evidence that police failed to respond diligently to plaintiff's requests for aid against her abusive boyfriend was

insufficient to make out claim of intentional gender discrimination); *Mody v. City of Hoboken*, 959 F.2d 461, 465–467 (3d Cir. 1992) (evidence that police failed to arrest attackers of minority victim who later attacked and killed plaintiff's son was insufficient to make out claim of intentional ethnic discrimination absent direct evidence of ethnically derogatory statements by police officers or a pattern of similar conduct in cases involving victims of same ethnicity); *cf. Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir.1988) (denial of leave to amend equal protection claim of intentional gender discrimination was erroneous where complaint alleged that police officers who responded to plaintiff's complaints about her estranged husband's abusive behavior made statements that "strongly suggested . . . animus against abused women").

Plaintiffs' showing that one officer or even the police department as a whole acted slowly in response to Keichler's repeated attacks does not of itself show discriminatory intent. Moreover, plaintiffs themselves ascribe the delay in the investigation to a failure in communication between a non-Hmong-speaking officer and non-English-speaking victims. They do not assert that Officer Nelson or any of the municipal defendants are racist or prejudiced against persons of Hmong ancestry. Nowhere in this accumulation of evidence do plaintiffs point to any direct or indirect evidence of racial animus toward Hmong individuals by the municipal defendants. For example, they have shown no evidence indicating that Officer Nelson, any other police officer, or anyone in Chico city government made any racist or biased comments against Hmong people. *Cf. Balistreri*, 901 F.2d at 701; *Navarro*, 72 F.3d at 716–717; *Mody*, 959 F.2d at 467.

 .3d 449 (1st Cir.1998); *Ricketts v. City of* *Columbia*, 36 F.3d 775 (8th Cir.1994).

For these reasons, plaintiffs have presented insufficient evidence of discriminatory intent in any delay of the investigation. That claim rests entirely on the alleged failure to provide adequate interpreter services, and for the reasons already stated, the Equal Protection Clause does not require interpreter services in the circumstances alleged here. Plaintiffs' constitutional equal protection claim must therefore fail.

## B. Plaintiffs' FHA and FEHA Claims

The Mouas, Lee, and Vue have also brought claims against the municipal defendants under 42 U.S.C. §§ 3604(a), 3604(b), and 3617 of the FHA, as well as under Gov't Code §§ 12955(a), 12955(k), and 12955.7 of FEHA. The provisions of FEHA involved in this case protect substantially the same rights as the FHA provisions at issue and are subject to the same analysis. *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n. 8 (9th Cir. 2001); *Egan v. Schmock*, 93 F.Supp.2d 1090, 1094 (N.D.Cal.2000).

The three FHA provisions under which plaintiffs have brought suit prohibit different types of practices. Section 3604(a) makes it illegal to "make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Plaintiffs claim that the municipal defendants' failure to provide interpreters and to properly investigate the incidents with Keichler denied them housing because of their Hmong ancestry. Section 3604(b) makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Plaintiffs claim that the municipal defendants' actions discriminated against them in the provision of police services in connection with their dwelling because of their Hmong ancestry. Finally, § 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of ... any right granted or protected by section ... 3604 ... of this title." 42 U.S.C. § 3617. Plaintiffs claim that the municipal defendants have "interfered" with their exercise of rights protected by §§ 3604(a) and 3604(b) by discriminating against them in the provision of police services because of their Hmong ancestry.

### 1. Vue and Lee's Standing

■ The municipal defendants challenge Vue and Lee's standing to sue under the FHA and FEHA because the injury they allege is qualitatively different from that of the Mouas. Whereas the Mouas lived at Orchard Court and assert an injury to their housing rights, Vue and Lee only claim that they were deterred from visiting the Mouas at the Mouas' apartment by the municipal defendants' allegedly inadequate response to the Mouas' repeated requests for help against Keichler. (Defs.' Mot. at 6, 7; Defs.' Reply at 7.) The municipal defendants argue that the FHA does not protect any right to visit but only the right to live in housing of one's choice free from discrimination.

There is a dearth of case law supporting the notion of FHA standing based on deterrence from visiting a friend's residence. On first reading of the statutory language, it would seem that Vue and Lee would not have standing because they have not been deterred from moving into, forced to move out of, or otherwise harmed in the exercise of their fair housing rights while living at Orchard Court. However, in *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470 (9th Cir.1998), the Ninth Circuit held that "[u]nder the Act, any person harmed by discrimination, whether or not the tar-

get of the discrimination, can sue to recover for his or her own injury. This is true, for example, even where no housing has actually been denied to persons protected under the Act." *Id.* at 475 (upholding FHA standing of hotel owners in suit alleging that city interfered with fair housing rights of mentally ill, where city impeded approval of a loan that was required to complete hotel owners' sale of property to housing developers for the mentally ill) (citations omitted); *see also Smith v. Stechel,* 510 F.2d 1162, 1164 (9th Cir.1975) (real estate agent fired for renting apartments to minorities permitted to maintain FHA claim); *Harris v. Itzhaki,* 183 F.3d 1043, 1050 (upholding FHA standing of minority tenant based on apartment owners' discriminatory treatment of unrelated minority rental tester).

Thus, under *San Pedro Hotel,* Vue and Lee have standing even though neither lived at Orchard Court. They have alleged an injury-in-fact—the deterrent effect that the municipal defendants' actions allegedly had on their willingness to visit the Mouas at their apartment—causation and redressability. These allegations suffice to establish Article III standing. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (an FHA plaintiff establishes standing by alleging merely that "as a result of the defendant's actions he has suffered a distinct and palpable injury").

### 2. *Merits of Plaintiffs' FHA and FEHA Claims*

Plaintiffs can establish an FHA violation under either a disparate treatment theory or a disparate impact theory. While a showing that defendant acted with discriminatory intent is required to prevail on a disparate treatment theory, it is not required to make out an FHA violation under a disparate impact theory. *Keith v. Volpe,* 858 F.2d 467, 482 (9th Cir.1988). As explained in the discussion of plaintiffs'

equal protection claim, plaintiffs have failed to present sufficient evidence to show that the municipal defendants acted with discriminatory intent. *See supra* pp. 1139–41. Plaintiffs therefore cannot establish an FHA violation on a disparate treatment theory. Thus, to defeat summary judgment on their FHA claims, they must come forward with sufficient evidence to show that the municipal defendants' alleged failure to provide interpreters for non-English-speaking crime victims had a disparate impact on Hmong crime victims.

■ To prevail on a disparate impact theory, plaintiffs must present a prima facie case, which consists of "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble v. City of Escondido,* 104 F.3d 300, 306 (9th Cir.1997) (quoting *Pfaff v. U.S. Dep't of Housing & Urban Dev.,* 88 F.3d 739, 745 (9th Cir.1996)). Plaintiffs must directly prove the discriminatory impact alleged; they may not rely on inferences from circumstantial evidence. *Id.* If plaintiffs establish a prima facie case of disparate impact, the burden of production then shifts to defendants "to articulate some legitimate, nondiscriminatory reason for the action." *Harris,* 183 F.3d at 1051. If defendants rebut plaintiffs' prima facie case with such a legitimate, nondiscriminatory reason, then the burden shifts back to the plaintiffs to at least raise a genuine factual question as to whether this reason is pretextual. *Id.*

■ Plaintiffs have not presented sufficient evidence to show that the municipal defendants' actions had a disparate impact on them or on Hmong crime victims generally, and they therefore do not establish a prima facie disparate impact case. The

undisputed facts show that the municipal defendants provide some interpreter services for non-English-speaking crime victims. The Chico Police Department employs Community Service Officer Fong Lor to interpret for non-English-speaking Hmong individuals at crime scenes, and Chico police officers have access to an AT & T language line to translate for Hmong individuals. (Defs.' Mot. at 26–27.)

Plaintiffs have presented no evidence (statistical or otherwise) to show that the effectiveness of police-civilian communications varies across ethnic or language groups in Chico. The only statistical evidence purporting to support a disparate impact theory is an expert report from Dr. John R. Logan, an urban sociologist and social demographer. *See* Pliscou Decl., Ex. D. Relying on language data from the 2000 census and the California Department of Education's School Language Survey, Dr. Logan concludes that there are over 1000 Hmong speakers in the City of Chico and close to 4000 Hmong speakers in Butte County. According to his calculations, these numbers amount to two percent of the population of both the City of Chico and Butte County, and Hmong is the most commonly spoken language in Chico and Butte County after English and Spanish. But these statistics do nothing to indicate that the municipal defendants' practices regarding interpreters and relations with non-English-speaking crime victims have had a disproportionately harmful effect on Hmong crime victims such as to make a prima facie case under § 3604(b).

Plaintiffs have also failed to present any evidence to show that the municipal defendants' practices have had a disproportionately negative impact on Hmong residency at Orchard Court or anywhere else in Chico or Butte County in violation of § 3604(a). The undisputed facts show that, after the series of incidents between the Mouas and Keichler, five more Hmong families (including Vue's brother) moved into the Orchard Court complex, thereby doubling the Hmong population at Orchard Court. (Defs.' Mot. at 6–7.) Plaintiffs' failure to provide any evidence of a negative effect on Hmong housing populations elsewhere in Chico stemming from the municipal defendants' conduct further undermines their FHA and FEHA claims. Since plaintiffs have not come forward with sufficient evidence to allow a jury to find that the municipal defendants provide police services in a manner causing a disparate impact on non-English-speaking Hmong residents, summary judgment will be entered on their FHA and FEHA claims.

### III.

The Equal Protection Clause protects against invidious discrimination based on race, ethnicity, or national origin. It does not proscribe government actions that have a disproportionate impact on non-English speakers, as long as those actions are supported by a rational basis. Plaintiffs have failed to show that the Hmong language should be equated with Hmong ethnicity for purposes of equal protection analysis in this case. They have also failed to show that the municipal defendants acted with discriminatory intent towards people of Hmong ethnicity in investigating Keichler's conduct. Finally, plaintiffs have failed to show that the municipal defendants' practices have had a disparate impact on the fair housing rights of the Hmong population in Chico.

For the foregoing reasons, the municipal defendants' motion for summary judgment as to all of plaintiffs' federal and FEHA claims against them is GRANTED. The court declines to exercise supplemental jurisdiction over plaintiffs' state-law writ of mandate claim under Gov't Code § 11135. *See* 28 U.S.C. §§ 1367(c)(1), (3). In accor-

dance with the agreement of all the parties, the plaintiffs' motion for partial summary judgment as to their claims against defendant Keichler is STAYED pending the conclusion of state criminal proceedings against Keichler.

IT IS SO ORDERED.