[Nos. 57445-1-I; 57446-9-I; Division One. January 22, 2008.] 57447-7-I.

HAJRUDIN KUSTURA ET AL., *Appellants*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

656

660

*Ann Pearl Owen* (of *Ann Pearl Owen, PS*), for appellants.

*Robert M. McKenna, Attorney General, John R. Wasberg, Senior Counsel,* and *Johnna S. Craig, Spencer W. Daniels,* and *Masako Kanazawa, Assistants,* for respondent.

*Christie L. Snyder, Pamela Jo DeVet,* and *Aaron H. Caplan* on behalf of American Civil Liberties Union of Washington, amicus curiae.

*Kelly A. Owen, Katherine Frances Laner,* and *Patrick M. Pleas* on behalf of Northwest Justice Project, amicus curiae.

*Paula T. Olson* on behalf of Washington Self-Insurers Association, amicus curiae.

*Bryan P. Harnetiaux, Kelby D. Fletcher,* and *Michael J. Pontarolo* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 AGID, J. — Three injured workers of limited English proficiency (LEP) appeal a superior court order affirming orders of the Board of Industrial Insurance Appeals (Board). The superior court concluded (1) two of the workers' failure to appeal orders from the Department of Labor and Industries (Department) determining their wages for the time-loss compensation rate prevented appellate review of those wage calculations, (2) the timely-appealed Department order correctly calculated the wage rate, and (3) the workers were not entitled to additional interpreter services for Department claim administration and Board appeals. Because the unappealed Department orders became final and binding, the timely-appealed wage rate order correctly excluded additional employer-paid benefits, and the workers fail to show that they were prejudiced by the Department's notices and the Board's interpreter procedures, we affirm.

## FACTS

*Kustura*

¶2 Hajrudin Kustura is a Bosnian immigrant who does not understand or speak English and became an employee of Dependable Building Maintenance (DBM) in March 1999. As a union member, he was eligible for medical, life, and accidental death and dismemberment insurance, and short-term disability insurance. DBM made payments of $110 per month to the union health and welfare trust fund,

and the trust paid his health insurance premiums. DBM also made regular payroll deductions from wages for contributions to Social Security, Medicare, unemployment compensation, and industrial insurance.

¶3 On October 12, 1999, Kustura suffered a back injury while working for DBM and applied for and received benefits which the Department based on a wage rate that included DBM's contribution to his health care coverage. He timely appealed to the Board from Department orders that determined this wage rate. He argued that the rate should have included his cost of replacing health care insurance rather than the employer's contribution amount. He also asserted it should include employer contributions to life, disability, and accidental death and dismemberment insurance; pension benefits; and government-mandated benefits, including Social Security, Medicare, unemployment compensation, and industrial insurance. Additionally, he requested interpreter services on appeal and reimbursement for his interpreter costs.

¶4 At a hearing before an Industrial Appeals Judge (IAJ), Kustura received interpreter services for his testimony, but the IAJ denied his request for an interpreter for his communications with counsel. The IAJ heard testimony that the employer paid $110.00 monthly for Kustura's health care benefits, but that the trust paid monthly premiums of $167.49 for health care coverage and $37.31 for dental coverage. This testimony was not interpreted.

¶5 The IAJ issued a proposed decision and order affirming the Department's order and concluding that it correctly used the $110 per month figure as the value of DBM's contribution to his health care coverage. The IAJ also found that the wage calculation properly excluded the value of DBM's contributions to his dental coverage; his life, disability, and accidental death and dismemberment insurance; pension benefits; and government-mandated benefits of unemployment compensation, workers' compensation, Social Security, and Medicare. The IAJ further concluded that interpreter services were not necessary for the other wit-

nesses' testimony and that the Board was not required by statute to provide interpreter services for his communications with counsel.

¶6 Kustura appealed the IAJ's order to the full Board, which issued a decision and order affirming the IAJ's decision that the Department used the correct amount to calculate the employer's contribution to the health benefits and properly excluded the other employer-paid benefits and contributions to government-mandated benefits.[1] The Board's order did not specifically address the IAJ's order on the interpreter services issue but stated generally that it affirmed the IAJ's rulings.

## Lukić

¶7 Gordana Lukić came to the United States from Serbia, and, like Kustura, she is not fluent in English. In 1998, she began working for the Four Seasons Olympic Hotel as a housekeeper and received employee benefits that included medical, dental, life, and long-term disability insurance. In January 2000, she injured her back while working and later developed a major depressive disorder related to the injury. She applied for and received benefits from the Department. In February 2000, the Department issued an order terminating time-loss compensation because she returned to work, but left the claim open and established a wage rate. She filed a protest and request for reconsideration of this wage rate based on *Cockle v. Department of Labor & Industries*,[2] and the Department issued an order on March 15, 2001, calculating her wage rate to include an additional $109.36 in employer-paid health care benefits. She did not protest or appeal this order.

¶8 She did appeal later Department orders that denied time-loss compensation during certain time periods and

---

[1] The Board did correct the IAJ's erroneous conclusion of law which stated that dental insurance could not be included in the wage calculation.

[2] 142 Wn.2d 801, 16 P.3d 583 (2001) (requiring that employer-paid health benefits be included in wage calculation).

closed the claims with time-loss compensation without an award for permanent partial disability. In these appeals, she also challenged her wage rate calculation asserting, like Kustura, that other employer-paid benefits should be included. She also requested interpreter services during the appeal hearings, including communications with her attorney.

¶9 During a conference with the IAJ on these appeals, Lukić asserted that she was entitled to *Cockle* benefits in the wage rate calculation, and the IAJ allowed her to proceed on that issue despite her failure to appeal the order that determined the rate. At some point during the appeal hearing, the IAJ recused herself and a different IAJ presided over the hearing. The new IAJ noted "a problem with the jurisdiction" on the "*Cockle* issue" and gave the parties time to provide argument on the Board's jurisdiction over this issue.

¶10 The IAJ then heard testimony about Lukić's disability status and need for further treatment. Lukić also presented testimony about the value of the employer-paid benefits she sought to include in the wage calculation. The IAJ provided interpreter services for the witnesses' testimony, but not for Lukić's communications with counsel.

¶11 In a proposed decision and order, the IAJ concluded that the Department orders should be reversed, finding that Lukić was a temporarily and totally disabled worker under RCW 51.32.090 and ordered the Department to pay time-loss compensation and reopen her claim for further treatment. The IAJ deemed waived her challenge to the wage rate calculation because she did not appeal the Department's March 15, 2001 order determining that rate. Neither party submitted argument or authority on the Board's jurisdiction over the issue.

¶12 Lukić appealed the IAJ's decision to the full Board and asked the Board to provide interpreter services for all aspects of claim administration and all phases of litigation. The Board agreed with the IAJ that it did not have jurisdiction over the wage computation issue because Lukić

did not appeal the original order determining the wage rate. The Board further agreed with the IAJ that the Department's other orders should be reversed and remanded for the Department to determine that she was permanently totally disabled and pay time-loss compensation benefits accordingly.

¶13 On the interpreter issue, the Board concluded that it had only appellate jurisdiction and lacked authority to direct the Department in its initial claim administration. The Board also concluded that RCW 2.43.040 does not require interpreters at Board expense for trial preparation. It ruled that Lukić did not demonstrate that the Board's failure to provide and pay for these additional services violated her due process rights or deprived her of equal protection of the law. The Board further concluded that it was within the IAJ's discretion to provide interpreter services only while in open court and not for Luki´c's communications with her attorney.

*Memišević*

¶14 Maida Memišević is also a Bosnian immigrant who is not fluent in English. Like Kustura, she worked as a janitor for DBM and received benefits under the union contract. DBM contributed to the union trust fund that paid for her health care; pension benefits; and life, accidental death, and disability insurance benefits, and made regular payroll deductions from wages for contributions to government-mandated programs.

¶15 On November 1, 2001, Memišević injured her back on the job and applied for and received benefits from the Department. On February 22, 2002, the Department issued an order calculating her wage rate for time-loss compensation to include $252 for monthly employer-paid health care insurance. She did not protest or appeal this order.

¶16 In January and February 2003, the Department issued three additional orders paying time-loss compensation based on this rate. She appealed these three orders, requesting recalculation of benefits, translation services,

issuance of orders in Bosnian, and a declaration that she did not waive any right to relief because decisions were not communicated to her in her native language. She also appealed a Department letter that denied her request to provide interpreter services for communications with her attorney.

¶17 On appeal, the IAJ heard testimony about DBM's contributions to her health care coverage and other employer-paid benefits. Memišević also testified that she used an interpreter "every time" she received a Department document. In a proposed decision and order, the IAJ affirmed the Department orders, concluding that Memišević's failure to appeal the February 22, 2002 order determining the wage rate precluded review of that order and that she was not entitled to Department payment for interpreter services for communications with her attorney. She appealed this decision to the full Board, which affirmed the IAJ's order.

*Appeal to Superior Court*

¶18 All three workers sought review of the Board orders in appeals to the superior court. The superior court consolidated the appeals and affirmed the Board's orders, concluding (1) Lukić and Memišević's failure to appeal orders determining their wage rates precludes review of those rates in later orders applying those rates; (2) Kustura's wage rate orders were correct because the other employer-paid benefits he sought to include in the wage calculation were not "in-kind consideration that a worker must replace while disabled" or "critical to the worker's health or survival"; and (3) interpreters are required only during legal proceedings and not for matters outside of the proceeding itself. All three workers moved for reconsideration of the superior court's order, which was denied.

### I. *Appeals of Wage Rate Orders*

¶19 Lukić and Memišević contend that the Board erred by ruling that their failure to appeal the initial wage rate

orders prevents them from challenging that rate. They argue that because the appeal notice was not communicated to them in their primary language, the appeal time limits were not triggered when they received the orders. Alternatively, they argue that they are entitled to equitable relief from strict compliance with the appeal deadlines. We disagree.

¶20 Washington's Industrial Insurance Act, Title 51 RCW, removes from the courts' jurisdiction all cases involving industrial injuries and gives finality to Department decisions. A Department order or judgment based on findings of fact becomes a complete and final adjudication binding upon both the claimant and the Department unless the action is set aside on appeal or vacated.[3] An unappealed Department order is res judicata on the issues the order encompassed,[4] and "[t]he failure to appeal an order, even one containing a clear error of law, turns the order into a final adjudication, precluding any reargument of the same claim."[5]

¶21 RCW 51.52.060(1) establishes appellate jurisdiction of Department orders. It provides that a person aggrieved by a Department order must file a notice of appeal to the Board "within sixty days from the day on which a copy of the order, decision, or award was communicated to such person."[6] Appellants Lukić and Memišević do not dispute that they did not file timely appeals of the orders determining their wage rate. Rather, they argue that because the Department did not translate its orders into Bosnian, the orders were not "communicated" to them within the statute's meaning. Thus, the time period within which to file

[3] *Marley v. Dep't of Labor & Indus.*, 125 Wn.2d 533, 537, 886 P.2d 189 (1994) (quoting *LeBire v. Dep't of Labor & Indus.*, 14 Wn.2d 407, 415, 128 P.2d 308 (1942)).

[4] *Kingery v. Dep't of Labor & Indus.*, 132 Wn.2d 162, 169, 937 P.2d 565 (1997) (citing *Abraham v. Dep't of Labor & Indus.*, 178 Wash. 160, 34 P.2d 457 (1934)).

[5] *Marley*, 125 Wn.2d at 538.

[6] RCW 51.52.060(1).

appeals of those orders was not triggered and does not bar them from appealing those orders.

¶22 But neither Lukić nor Memiševié *ever* appealed the wage rate orders. Thus, these are not untimely appeals of Department orders, but complete failures to appeal them. The only appeals before the Board were those of orders that applied the previously-determined wage rate: those that denied benefits and closed claims for Lukić, and those that authorized compensation for specified time periods for Memiševié. Thus, the Board has jurisdiction only over the propriety of those orders, not the underlying unappealed wage rate orders upon which they were based, and it is precluded from reconsidering their wage rate calculations.

■■ ¶23 The workers contend that they were prevented from appealing the orders because they were not "communicated" to them under the plain meaning of the statutory term, which they assert requires that the recipient understand the information. In *Rodriguez v. Department of Labor & Industries*,[7] the Washington Supreme Court interpreted "communicated" as used in this statute to require only that the worker received the order, not understood it. We note that this interpretation has not been overruled by our courts or changed by the legislature.[8]

---

[7] 85 Wn.2d 949, 952-53, 540 P.2d 1359 (1975). The court did ultimately hold that the worker was entitled to equitable relief from the time limit to file appeals because he was extremely illiterate and the Department knew or should have known of his illiteracy. *Id.* at 955.

[8] Amicus Northwest Justice Project (NJP) argues that the Department's internal policies suggest a departure from this interpretation, citing WAC 296-15--350(9) and a 2006 memo requiring employers to communicate with the worker in the worker's preferred language and to provide interpreter services for written communications and telephone contact between the worker and employer. We need not consider this issue as it was raised solely by Amicus. *See Seeley v. State*, 132 Wn.2d 776, 808, 940 P.2d 604 (1997). Nonetheless, we note that neither the WAC nor the memo compels a contrary interpretation: WAC 296-15-350(9) does not specifically address interpreter services, and as the Department points out, the 2006 memo has been updated to require interpreters for communications with an unrepresented LEP worker and with a represented LEP worker who contacts the Department without counsel and suggests that a request must be made to receive such services. Thus, this is not conclusive authority that interpreters must be provided for all communications with the Department. At most, it suggests they are to be provided when unrepresented claimants request them. This was not the

¶24 We hold that the record here demonstrates that Department orders were sufficiently "communicated" to Lukić and Memiševié to trigger the appeal time limit. Not only did they receive the orders, but most were sent to their attorneys, and they filed timely appeals of some of them, dispelling any suggestion that they were uninformed about the appeal process when they received the wage rate orders.[9] The claimants' failure to appeal them within the 60-day time period renders them final and binding, and the Board properly declined to reconsider the determination of wage rates communicated by these orders.

¶25 The workers further argue that even if they failed to comply with the appeal time limits, equity requires that they be excused from compliance.[10] Our courts have granted relief from strict compliance with the appeal time limits when the claimant is incompetent to understand the order's content and the Department knew or should have known of the claimant's incompetency.[11] But when the claimant has failed to exercise diligence in pursuing the claim and there is no Department misconduct, courts have refused to grant equitable relief.[12]

¶26 In *Rodriguez*, an injured worker was entitled to equitable relief from the 60-day time limit to file an appeal of a Department order that had closed his claim when the worker was "extremely illiterate," his interpreter was hospitalized and unable to interpret for him when he received the Department notice, and he left the area for six months

---

case for either Lukić or Memiševié: they were both represented by counsel, and counsel handled the Department communications.

[9] Curiously, the workers do not indicate whether the unappealed orders were sent to counsel or otherwise explain the circumstances surrounding the receipt of these orders or their failure to appeal them. We also note that these orders are not part of the appellate record.

[10] The Department asserts that the workers may not raise this issue because it was not argued below or addressed in the workers' opening brief. But because the Department raised this issue in its response brief, the workers appropriately addressed it in their reply. *See* RAP 10.3(c). Amici Washington State Trial Lawyers Association Foundation (WSTLAF) and NJP also raise this issue.

[11] *See Rodriguez*, 85 Wn.2d 949.

[12] *See Kingery*, 132 Wn.2d 162.

to be with his ill mother.[13] He filed an appeal approximately five months past the appeal deadline when he returned to the area and had his interpreter read him the Department notice.[14] While the court held that the Department sufficiently "communicated" the order to him to trigger the appeal time limit, it concluded that based on these particular facts, he should be excused from complying with that time limit.[15]

¶27 Similarly in *Ames v. Department of Labor & Industries*,[16] the court granted equitable relief to an injured worker who was declared legally insane and committed at Western State Hospital when the Department sent a notice rejecting his claim to his home address. When he sought to reopen the claim after his release from the hospital, the Department rejected the claim as untimely. The court reversed, holding that the facts were sufficient to warrant equitable relief because the Department acted ex parte while it knew the claimant was hospitalized and legally incapable of being heard or giving testimony.[17]

¶28 But in *Kingery v. Department of Labor & Industries*, the court declined to grant equitable relief from strict compliance with the same appeal time limits when the claimant, the worker's widow, failed to show that she was incompetent when she received the Department's order or that the Department engaged in misconduct.[18] The court further concluded that she did not exercise due diligence in pursuing her claim because the record did not adequately explain her eight-year delay in moving to set aside a Department order.[19]

---

[13] 85 Wn.2d at 955.

[14] *Id.* at 950.

[15] *Id.* at 952-55.

[16] 176 Wash. 509, 30 P.2d 239 (1934).

[17] *Id.* at 514.

[18] 132 Wn.2d 162, 177-78, 937 P.2d 565 (1997).

[19] *Id.* at 176-77.

¶29 Here, the record shows that unlike the claimants in *Rodriguez* and *Ames*, both Lukić and Memišević were available and competent at the time they received the Department orders. And unlike the appellants in *Rodriguez* and *Ames*, they cite no extraordinary circumstances preventing them from receiving the orders or timely challenging them. They were not mentally incompetent or physically confined like Ames, nor were they completely illiterate, without English speaking assistance, and physically out of the area during the appeal filing time period like Rodriguez. Rather, they both had attorneys and/or interpreters to assist them and did not explain why they did not appeal the wage orders when they were able to file timely appeals of other Department orders. Thus, as in *Kingery*, they are not entitled to equitable relief absent a showing that they were incompetent, that the Department committed misconduct, or that they exercised diligence in pursuing their claims.[20]

■ ¶30 The workers further argue that the Department's notice failed to comply with the black faced type requirements in RCW 51.52.050[21] and Executive Order 13166, which requires that programs provided in English are accessible to LEP persons. Because the workers did not

---

[20] WSTLAF contends that the *Kingery* plurality did not limit equitable relief to those cases involving incompetent or illiterate claimants and suggests a broader scope of such relief, citing *Fields Corp. v. Department of Labor & Industries*, 112 Wn. App. 450, 459, 45 P.3d 1121 (2002). We agree with WSTLAF's position, but it does not assist these claimants because both were represented by counsel and/or had access to interpreters and neither adequately explained the failure to appeal the wage orders, evidencing a lack of diligence.

[21] RCW 51.52.050 provides that a copy of a final Department decision must be sent to the worker and

shall bear on the same side of the same page on which is found the amount of the award, a statement, set in black faced type . . . that such final order, decision, or award shall become final within sixty days from the date the order is communicated to the parties unless a written request for reconsideration is filed with the department of labor and industries, Olympia, or an appeal is filed with the board of industrial insurance appeals, Olympia.

674

raise either argument in their appeals to the Board, we do not consider them.[22]

## II. Department Notices and Due Process

 ¶31 The workers further contend that the Department's failure to notify them of the appeal deadlines in their primary language violates due process.[23] Due process requires that the agency gave the appealing party adequate notice and an opportunity to be heard, and that procedural irregularities did not undermine the fundamental fairness of the proceedings.[24] Due process requires " 'such procedural protections as the particular situation demands.' "[25] In accordance with *Mathews v. Eldridge*, we weigh the following factors to determine what process is due in a particular situation: (1) the private interest at stake in the governmental action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government interest, including the additional burdens that added procedural safeguards would entail.[26]

 ¶32 The workers assert that the private interest at stake is their vested right to benefits from the Department. Our courts have held that all injured workers covered by

---

[22] See RAP 2.5(a); RCW 51.52.104 (providing that a petition for review of a Department order "shall set forth in detail the grounds therefor and the party or parties filing the same shall be deemed to have waived all objections or irregularities not specifically set forth therein"). The workers further argue that the Department's notice does not comply with public policy, citing RCW 2.43.010, which states the policy to secure the rights of non-English-speaking persons who cannot be fully protected in "legal proceedings" without interpretive assistance. As discussed below, this argument is based on the erroneous assumption that "legal proceedings" as used in that statute includes all Department actions.

[23] This issue does not relate to Kustura as he timely appealed his wage order and did not appeal any Department order denying him translated notices.

[24] *Sherman v. State*, 128 Wn.2d 164, 184, 905 P.2d 355 (1995).

[25] *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

[26] 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

the Industrial Insurance Act have a vested interest in disability payments upon determination of an industrial injury.[27] The Department argues that the workers' interests at stake here are not vested interests but are only claims for more benefits, citing *Harris v. Department of Labor & Industries*.[28] While the court held in *Harris* that a worker has only a future expectation of benefits, not a vested right, when the Department has not considered or determined whether the worker is permanently and totally disabled,[29] the court later held in *Willoughby* that all workers suffering an industrial injury "have a vested interest in disability payments upon determination of an industrial injury."[30]

¶33 Here, the Department made such a determination by allowing all the injured workers' claims and issuing orders entitling them to compensation. Their claims on appeal were challenges only to the amount of that compensation. They therefore had a vested right at stake.

¶34 Considering the second *Mathews* factor, the workers argue that the Department's procedures of providing notice of appeal deadlines in only English or Spanish and limiting LEP claimants' use of interpreters during Board hearings pose significant risks to LEP claimants. They argue that the inadequate notices of appeal deadlines are not reasonably calculated to inform them of the proceedings, so they may be wrongfully denied benefits. They contend that the Department knew the workers did not speak English but took no steps to ensure that they would receive actual, intelligible notice of the appeal deadlines.

¶35 Due process requires notice "reasonably calculated, under all the circumstances, to apprise inter-

---

[27] *Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 733, 57 P.3d 611 (2002).

[28] 120 Wn.2d 461, 475, 843 P.2d 1056 (1993).

[29] *Id.*

[30] *Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 733, 57 P.3d 611 (2002).

ested parties of the pendency of the action and afford them an opportunity to present their objections."[31] Our courts have not yet addressed whether due process requires that government notices be given to non-English-speaking persons in their primary language in civil economic matters that do not involve potential deprivation of liberty. The Ninth Circuit and courts in other jurisdictions that have addressed this issue have upheld the constitutionality of English-only notices.[32] These decisions reiterate the established principle that "due process allows notice of a hearing (and its attendant procedures and consequences) to be given solely in English to a non-English speaker if the notice would put a reasonable recipient on notice that further inquiry is required."[33] The cases upon which the workers rely do not apply here; they involved government notices that were held inadequate because they were sent with the government's knowledge that they were not likely to reach the recipient.[34]

¶36 We hold that on these facts, the Department's notices reasonably informed the recipients that they should make further inquiries and did not put them at risk of being

---

[31] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950) (citing *Milliken v. Meyer*, 311 U.S. 457, 61 S. Ct. 339, 85 L. Ed. 2d 278 (1940)).

[32] *See, e.g., Carmona v. Sheffield*, 475 F.2d 738, 739 (9th Cir. 1973) (no due process right to unemployment notices in Spanish); *Toure v. United States*, 24 F.3d 444, 446 (2d Cir. 1994) (no due process right to notice of administrative seizure in French); *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983) (no due process right to Social Security notices in Spanish), *cert. denied*, 466 U.S. 929 (1984).

[33] *Nazarova v. Immigration & Naturalization Serv.*, 171 F.3d 478, 483 (7th Cir. 1999); *see also Guerrero v. Carleson*, 9 Cal. 3d 808, 512 P.2d 833, 836, 109 Cal. Rptr. 201 (1973) ("the government may reasonably assume that the non-English speaking individual will act promptly to obtain assistance when he receives the notice in question"), *cert. denied*, 414 U.S. 1137 (1974); *Soberal-Perez*, 717 F.2d at 43 ("A rule placing the burden of diligence and further inquiry on the part of a non-English-speaking individual served in this country with a notice in English does not violate any principle of due process.").

[34] *See, e.g., Jones v. Flowers*, 547 U.S. 220, 126 S. Ct. 1708, 164 L. Ed. 2d 415 (2006) (foreclosure notices inadequate when sent certified mail to house in which owner did not live and returned unclaimed to government); *Covey v. Town of Somers*, 351 U.S. 141, 76 S. Ct. 724, 100 L. Ed. 1021 (1956) (foreclosure notice that was mailed, posted, and published was inadequate when official knew property owner was incompetent and without guardian).

wrongfully denied benefits. Both Lukić and Memišević had counsel, Memišević used an interpreter, and both had knowledge of the appeal process, having previously filed timely appeals. Most importantly, they both obtained benefits from the Department and Lukić also obtained permanent disability status, which increased her benefits. Thus, they have not shown that the procedures used here caused a risk that they would be erroneously denied benefits.

■■ ■ ¶37 Finally, were we to find a due process problem under *Mathews*, the Department provides convincing arguments that the burden of providing complete, free interpreter services for all LEP workers would create a huge budgetary burden it is not able to withstand. In the absence of a showing that workers are significantly prejudiced by the Department's procedures, there is no due process violation.

III. *Interpreter Services for "Proceedings" under Chapter 2.43 RCW*

■■ ¶38 The workers next argue that RCW 2.43.030 requires interpreters at all phases of claim administration at the Department level and for all proceedings before the Board.[35] Chapter 2.43 RCW governs (1) the provision of interpreters at legal proceedings and (2) who bears the cost of such services. RCW 2.43.030 addresses the appointment of interpreters and provides:

Whenever an interpreter is appointed to assist a non-English-speaking person in a legal proceeding, the appointing authority shall, in the absence of a written waiver by the person, appoint

---

[35] We note that while it was raised below, the workers did not raise this specific issue on appeal. WSTLAF and NJP first raised it in their amicus briefs, and the workers addressed it only in their reply to the Department's response to amicus. But we will consider it because it is necessary to reach a proper decision. *See Seeley*, 132 Wn.2d at 808 (recognizing that this court need not address issues raised solely by amicus or not raised at trial court unless necessary to reach a proper decision).

a certified or a qualified interpreter to assist the person throughout the proceedings.[36]

> [W]hen a non-English-speaking person is a party to a legal proceeding, or is subpoenaed or summoned by an appointing authority or is otherwise compelled by an appointing authority to appear at a legal proceeding, the appointing authority shall use the services of only those language interpreters who have been certified by the administrative office of the courts, unless good cause is found and noted on the record by the appointing authority. . . .[37]

Board regulations provide that when a non-English-speaking person is a party or a witness in a hearing before the Board, the IAJ "may appoint an interpreter to assist the [non-English-speaking] party or witness throughout the proceeding."[38] "Legal proceeding" is defined as "a proceeding in any court in this state, grand jury hearing, or hearing before an inquiry judge, or before an administrative board, commission, agency, or licensing body of the state or any political subdivision thereof."[39]

¶39 RCW 2.43.040 addresses the cost of such services and provides:

> In all legal proceedings in which the non-English-speaking person is a party, or is subpoenaed or summoned by the appointing authority or is otherwise compelled by the appointing authority to appear, including criminal proceedings, grand jury proceedings, coroner's inquests, mental health commitment proceedings, and other legal proceedings initiated by agencies of government, the cost of providing the interpreter shall be borne by the governmental body initiating the legal proceedings.[40]

> In other legal proceedings, the cost of providing the interpreter shall be borne by the non-English-speaking person unless such

---

[36] RCW 2.43.030(1).

[37] RCW 2.43.030(1)(b).

[38] WAC 263-12-097(1).

[39] RCW 2.43.020(3).

[40] RCW 2.43.040(2).

person is indigent according to adopted standards of the body. In such a case the cost shall be an administrative cost of the governmental body under the authority of which the legal proceeding is conducted.[41]

Board regulations authorize the Board to pay for interpreter services when the IAJ appoints an interpreter.[42]

¶40 The workers argue that the Department's and the Board's failure to provide an interpreter at every stage of the proceedings violated RCW 2.43.030.[43] They assert that the statute's requirement that a qualified interpreter must be appointed to assist "throughout the proceedings" includes all discussion on and off the record, all argument, all rulings, all witness testimony, and all communications with counsel.[44] Thus, we must determine (1) what the statutory term "legal proceeding" encompasses and whether it includes Department actions and (2) whether sufficient interpreter services were provided here to assist the workers "throughout the proceedings."

¶41 The workers argue that interpreters are required during all Department and Board actions, urging us to adopt a broad interpretation of "legal proceeding" and hold that it encompasses "[a]ny procedural means for seeking redress from a tribunal or agency."[45] The Department

---

[41] RCW 2.43.040(3).

[42] WAC 263-12-097(4).

[43] We note that only Memiševic̀ requested services at the Department level and appealed a Department letter denying such services. Thus, Kustura and Lukić have waived any claim to services at the Department level.

[44] Amicus American Civil Liberties Union of Washington (ACLU) also asserts that interpreter services are required for perpetuation depositions. But none of the workers briefed this issue or included it in their assignments of error; it was mentioned only in a later brief the workers submitted in response to the Department's answer to amicus. Thus, we do not reach the issue. *See* RAP 2.5; *Seeley*, 132 Wn.2d at 808; *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issues first raised in reply are too late to warrant consideration). But we note, as discussed below, that the record here shows no prejudice resulting from the denial of interpreter services at perpetuation depositions.

[45] WSTLAF Br. at 16 (citing BLACK's LAW DICTIONARY 1241 (8th ed. 2004)). Another definition states, "The business conducted by a court or other official body; a hearing." *Id.*

concedes that the statute applies to Board proceedings but contends that claim administration at the Department level is not a "legal proceeding" governed by the statute. We agree.

¶42 In the phrase "hearing before an inquiry judge, or before an administrative board, commission, agency, or licensing body of the state or any political subdivision thereof," the second clause, "before an administrative board, commission, [etc.]," modifies only the word "hearing," which immediately precedes those qualifying prepositional phrases.[46] Thus, because Department action is neither a court proceeding; a grand jury hearing; nor a hearing before an inquiry judge, an administrative board, commission, agency, or licensing body of the state or any political subdivision thereof, it is not a "legal proceeding" within the meaning of the statute and is not subject to the interpreter requirements. We hold that the statute applies only to hearings before the Board and requires the Board to appoint an interpreter to assist a non-English-speaking claimant "throughout the hearing."[47]

¶43 We further hold that under the circumstances present here, the statute does not require the Board to pay for these services. RCW 2.43.040 provides that only the "initiating" government body must fund such services. Washington State Trial Lawyers Association Foundation argues that because the Department must notify an injured worker of his rights before a claimant may apply for benefits, the Department initiates the action that the Board reviews. But this ignores the fact that the Board's authority may be invoked only by the *claimant's* act of initiating an appeal of the Department's action. Thus, the Board cannot be the body "initiating" such proceedings, and the non-

---

[46] *See Berrocal v. Fernandez*, 155 Wn.2d 585, 593, 121 P.3d 82 (2005) (" '[U]nless a contrary intention appears in the statute, qualifying words and phrases refer to the last antecedent.' " (quoting *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 781, 903 P.2d 443 (1995))).

[47] RCW 2.43.030. This includes all communications during the hearing, but the statute does not include matters beyond the hearing itself, including communications with counsel outside of the hearing and other trial preparation.

English-speaking person must bear the cost of using interpreters during such hearings unless indigency is established.[48]

■■ ■■ ¶44 We note that the Board's regulations provide for appointment of interpreters at Board expense and, like the statute, require that the appointed interpreter assist the claimant "throughout the proceeding."[49] We therefore hold that once the Board appoints an interpreter at Board expense, the Board may not prevent the interpreter from translating whenever necessary to assist the claimant during the hearing.

¶45 Here, the Board did appoint interpreters for each of the hearings at Board expense. Thus, we need determine only whether the Board provided sufficient interpreter services to assist the workers throughout the hearing, in compliance with the statute and Board regulations. The Board provided interpreters for all witness testimony for Lukić's and Memiševic's hearings and for Kustura's testimony. But by not providing an interpreter for all other witness testimony at Kustura's hearing or for communications with counsel during any of the hearings, the Board failed to comply with the statute's directive and its own regulations, which require it to provide an interpreter to assist the workers "throughout the proceeding."[50] However, none of the workers demonstrates prejudice as a result of the Board's failure to comply with the statute, so we can find no reversible error. Each worker was represented by

---

[48] RCW 2.43.040(3). The workers assert for the first time in their reply to the Department's response to amicus argument that the Department failed to assess their indigency status and, if necessary, the panel should order remand for that determination. Such arguments are too late to warrant our consideration. *See Cowiche Canyon*, 118 Wn.2d at 809.

[49] WAC 263-12-097(1), (4).

[50] Kustura also asserts that the IAJ prevented him from using his own interpreter for communications with counsel or for any other translation during the hearing. While the record does not support these allegations, we recognize it may be an incomplete record and note that the Board may not prohibit claimants from bringing their own interpreters to the hearing or prevent those interpreters from participating in whatever way will assist the claimant in understanding the proceedings.

counsel, presented evidence and legal argument, pursued appeals, and obtained benefits from the Department.

¶46 While the workers contend that the Department's procedures prevented them from speaking with counsel or understanding certain witness testimony, they do not demonstrate actual resulting prejudice. In Kustura's case, the wage determination issues were largely legal and involved expert testimony about what employer contributions should be included in the wage rate. As the Board noted, there was no conflict in that testimony. Thus, it is unlikely that Kustura could have offered critical input on these issues even if the entire hearing were translated for him, and he makes no offer of proof to the contrary. Likewise Lukić and Memišević fail to demonstrate prejudice. In both cases, the Board provided an interpreter for all testimony taken and statements made throughout the hearings but did not provide an interpreter for perpetuation depositions or attorney communications.[51] Nonetheless, both obtained benefits from the Department, and Lukić was awarded additional compensation based on a finding that she was totally and permanently disabled.

## IV. *Interpreter Services and Due Process*

¶47 The workers further argue that the limited provision of interpreter services at both the Department and Board level violates procedural due process because the limitations deprive LEP claimants of a meaningful opportunity to be heard. They contend that the Board's failure to provide interpreters for attorney-client communications

---

[51] As noted above, neither worker assigned as error or briefed the issue of whether interpreters were required for perpetuation depositions. Because it was raised by amicus and addressed by the workers only in a response to the Department's answer to amicus, we do not address this issue here. *See Seeley*, 132 Wn.2d at 801; *Cowiche Canyon*, 118 Wn.2d at 809. Nonetheless, we note that the only testimony given for a perpetuation deposition related to the value of employer-paid benefits and the purely legal issue of whether they were to be included in Memišević's wage calculation. As in Kustura's case, it is unlikely that she had any meaningful input on these issues, and she fails to show that not having an interpreter for this testimony prejudiced the outcome of her claim.

prevented them from understanding crucial testimony or speaking with their attorneys. Kustura also argues that because the Board did not provide an interpreter for witness testimony, he could not understand anything at the hearing except his own testimony. We have already addressed these claims in the context of holding that RCW 2.43.030 requires interpreter services to assist the claimant throughout Board hearings and need not reach that due process issue. To the extent that the workers contend due process requires interpreter services beyond those authorized by the statute and Board regulations, including free interpreter services at all hearings and for matters outside of the hearing to assist in trial preparation, we must reject that argument. There is no such due process right recognized in the civil context, and the workers have not provided any legal authority to the contrary.[52]

## V. *Equal Protection*

¶48 The workers also contend that their right to equal protection was violated because the Department's procedures gave preferential treatment to Spanish-speaking claimants and because they are not entitled to the same interpreter services as LEP recipients of benefits from the

---

[52] The ACLU cites criminal cases and cases that address the adequacy of interpreter services for pro se litigants who were denied interpreter services which are not at issue here. *See Figueroa v. Doherty*, 303 Ill. App. 3d 46, 707 N.E.2d 654, 659, 236 Ill. Dec. 527 (1999) (interpreter for pro se claimant failed to translate testimony word for word, provided only a summary of his testimony and argument which was largely indecipherable, and provided an incorrect summary of another witness's testimony); *Lizotte v. Johnson*, 4 Misc. 3d 334, 777 N.Y.S.2d 580, 586 (2004) (interpreter did not translate discussion between hearing officer and agency representative about seven exhibits, which were entire basis for hearing officer's adverse decision, for pro se claimant of foster care benefits); *Yellen v. Baez*, 177 Misc. 2d 332, 676 N.Y.S.2d 724, 726 (1997) (no interpreter provided to pro se litigant); *Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir. 1984) (asylum claimant's statutory interpreter rights violated when translation was "nonsensical," its accuracy was "subject to grave doubt," and claimant misunderstood nature and finality of proceeding). These cases do not provide a basis for us to expand the interpreter service requirements of chapter 2.43 RCW in the context of Board hearings.

Department of Social and Human Services (DSHS).[53] They note that the Department makes special accommodations for Spanish-speaking claimants, but not for other LEP claimants, and that LEP individuals receiving DSHS services are provided interpreter and translation services which are not available to LEP claimants seeking benefits from the Department.[54]

¶49 The Equal Protection Clause of the Washington State Constitution, article I, section 12, and the Fourteenth Amendment to the United States Constitution require that "persons similarly situated with respect to the legitimate purpose of the law" receive like treatment.[55] The level of scrutiny we apply in reviewing an equal protection challenge depends on whether a suspect or semisuspect classification has been drawn or a fundamental right is implicated; if neither is involved, we review the classification to determine whether the government had a rational basis for creating it.[56]

¶50 The workers do not identify a fundamental right but argue that Department procedures affect a suspect class based on national origin because the Department provides services that address Spanish-speaking claimants

---

[53] They also argue that they do not receive the same interpreter and translation services that are provided to LEP recipients of employment security benefits, citing WAC 192-12-173. But that regulation simply provides that the Employment Security Department shall maintain a compilation of the federal laws, regulations, and guidelines governing the operations of federal programs it administers and shall have at least one person available "to assist individuals seeking information on such programs." It does not require that the agency provide interpreters and translators "in a similar fashion" as DSHS, as the workers claim, and they do not cite any other authority to support this assertion.

[54] The workers also argue for the first time in their response to the Department's answer to amicus that there is no rational basis for treating LEP claimants differently from hearing-impaired claimants, who are provided free interpreter services, citing *State v. Marintorres*, 93 Wn. App. 442, 969 P.2d 501 (1999). But *Marintorres* involved interpreter costs for a defendant in the criminal context, where the government clearly initiates the proceedings, and does not apply here. And here the Board did provide and pay for interpreters at the workers' hearings.

[55] *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992).

[56] *Andersen v. King County*, 158 Wn.2d 1, 18-19, 138 P.3d 963 (2006) (citing *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996); *State v. Harner*, 153 Wn.2d 228, 236, 103 P.3d 738 (2004)).

but not other LEP claimants.[57] A suspect class "must have suffered a history of discrimination, have as the characteristic defining the class an obvious, immutable trait that frequently bears no relation to ability to perform or contribute to society, and show that it is a minority or politically powerless class."[58] Race, alienage, and national origin are suspect classifications.[59] But language alone does not identify one as a member of a suspect class.[60] As the Ninth Circuit has explained:

> Unlike race, place of birth, or sex, language is not one of those "immutable characteristic[s] determined solely by the accident of birth" which typically are the basis for finding a suspect class. *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S. Ct. 1764, 1770, 36 L. Ed. 2d 583 (1973). Although our first choice of language may be initially determined to some extent "by the accident of birth," *id.*, we remain free thereafter to choose another should we decide to undertake the initiative. Indeed, bilingualism or multilingualism is hardly an extreme rarity today, as [plaintiff's] own bilingualism exemplifies. Moreover, even if a significant percentage of those speaking a particular language can be shown to be of one "discrete and insular" racial or ethnic minority, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4, 58 S. Ct. 778, 783 n.4, 82 L. Ed. 2d 1234 (1938), not all persons speaking that language would be so situated. The court would thus face the problem of blurred lines defining those persons entitled to heightened protection from use of the challenged classification, with the

[57] These services include brochures and web site information on rights in Spanish, Spanish fluent employees, Spanish form letters, an internal Spanish translation system, Spanish telephone communication, and accommodating requests to translate documents into Spanish.

[58] *Andersen*, 158 Wn.2d at 19 (citing *Hanson v. Hutt*, 83 Wn.2d 195, 199, 517 P.2d 599 (1973)).

[59] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

[60] *Soberal-Perez*, 717 F.2d at 41 (citing *Carmona*, 475 F.2d at 739; *Frontera v. Sindell*, 522 F.2d 1215, 1219-20 (6th Cir. 1975)); *Olagues v. Russoniello*, 770 F.2d 791, 801-02 (9th Cir. 1985).

possibility of overbroad protection leading to the striking down of otherwise rationally based official action. . . .[61]

■■■ ¶51 The workers assert that "language is a proxy for national origin," and a classification based on national origin "is what is involved here [because the] injured workers' lack of English proficiency is linked to their national origin." We appreciate the analogy the workers propose, but it does not help them here. The few cases discussing language as a proxy for race or ethnicity in the equal protection context "have distinguished between governmental activities that target or isolate a particular language group and those that simply offer municipal programs or services in English and not other languages."[62] In *Moua v. City of Chico*, LEP plaintiffs who spoke Hmong as their primary language asserted that the Equal Protection Clause required a police department to provide an interpreter for any non-English-speaking victim of a crime who seeks police assistance.[63] The court held the plaintiffs failed to demonstrate that municipal resources devoted to Hmong interpretation services were rationally related to the city's legitimate interest in providing services to its residents on the most efficient and cost effective basis.[64] As the court explained:

> While there is some authority that singling out speakers of a particular language merits strict scrutiny, no case has held

---

[61] *Olagues*, 770 F.2d at 801 (first alteration in original).

[62] *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1137 (E.D. Cal. 2004) (citing *Hernandez v. New York*, 500 U.S. 352, 371-72, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (prosecutor's peremptory challenges of Spanish-speaking jurors may be pretext for ethnic discrimination); *Olagues v. Russoniello*, 797 F.2d 1511, 1520-21 (9th Cir. 1986) (United States Attorney's voter fraud investigation targeting foreign voters who requested bilingual ballots amounted to ethnic discrimination and subject to strict scrutiny), *vacated as moot*, 484 U.S. 806, 108 S. Ct. 52, 98 L. Ed. 2d 17 (1987); *Soberal-Perez*, 717 F.2d at 41-42 (providing English written forms and oral instructions to Social Security disability applicants not ethnic discrimination against Hispanic LEP applicants); *Frontera*, 522 F.2d 1215 (conducting civil service examination in English only was not ethnic discrimination against Hispanic LEP exam taker)).

[63] 324 F. Supp. 2d 1132, 1141 (E.D. Cal. 2004).

[64] *Id.* at 1139.

that the provision of services in the English language amounts to discrimination against non-English speakers based on ethnicity or national origin. Were the government to target a particular language group for differential treatment, the inference might be drawn that the intended target is the racial or ethnic group closely associated with that language group. But the facts and allegations here do not involve the singling out of one language group for a denial of interpreter services or the scrutiny or compulsion of persons speaking a particular language.[65]

¶52 Similarly, here the Department's procedures have not singled out these and other Bosnian-speaking workers as one particular language group and denied them benefits on that basis. As such, they did not create a suspect class based on national origin. Thus, we review the Department's procedures only for a rational basis. We conclude that its policy of providing services in English and Spanish is rationally related to its legitimate interest in providing services to claimants in the most effective and cost effective way. It reflects the Department's recognition that these are the primary languages spoken in Washington and the United States.[66] As the court observed in *Moua*, "while it might be a laudable goal for cities to provide interpreters for all language groups in the provision of all services, the practical ability to meet that goal in a diverse nation in an era of limited public funds may be doubted."[67]

¶53 Nor have the workers demonstrated that the Department engaged in facially neutral conduct that discriminated against them because there is no basis on which we can conclude that the Department intended to discriminate against a suspect class.[68] Discriminatory purpose " 'implies more than intent as volition or intent as aware-

---

[65] *Id.* at 1137-38.

[66] *See id.*

[67] *Id.* at 1138.

[68] *Soberal-Perez*, 717 F.2d at 41-42; *Macias v. Dep't of Labor & Indus.*, 100 Wn.2d 263, 270-71, 668 P.2d 1278 (1983).

ness of consequences.' "[69] It requires a showing that the challenged state action was taken at least in part " ' "because of" not merely "in spite of" its adverse effects upon an identifiable group.' "[70] The workers here have not established that the Department provides some services in Spanish in order to discriminate against Bosnian-speaking claimants. Rather, there is a legitimate noninvidious purpose for the Department to provide services in English and Spanish. It reflects the reality that these are the primary languages spoken both in this state and in the United States.[71]

¶54 The workers also contend that they were deprived of equal protection because they do not receive the same interpreter services as do LEP recipients of DSHS benefits. They assert that as a result of a 1991 consent decree, DSHS provides to LEP claimants all notices about entitlement to and changes in benefits in their primary language and interpreters for all oral communications with DSHS. But this is not a classification based on national origin or even language. It is based on the type of government benefits sought. LEP individuals who seek benefits from DSHS are given more comprehensive interpreter services than those who seek benefits from the Department. Because this is not a fundamental right or a suspect classification, we apply the rational basis test, which requires upholding the classification unless it rests on grounds which are not related to achieving its objectives.[72]

¶55 There is a rational basis for the distinctions made among different state agencies. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the

---

[69] *Soberal-Perez*, 717 F.2d at 42 (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)).

[70] *Id.* (quoting *Feeney*, 442 U.S. at 279).

[71] *Id.*

[72] *Tunstall v. Bergeson*, 141 Wn.2d 201, 226, 5 P.3d 691 (2000) (quoting *State v. Shawn P.*, 122 Wn.2d 553, 561, 859 P.2d 1220 (1993)), *cert. denied*, 532 U.S. 920 (2001).

problem at all. It is enough that the State's action be rationally based and free from invidious discrimination."[73] As discussed above, the Department may legitimately determine that it would be fiscally and logistically impractical to provide such a broad array of services based on its limited public funds.[74] Additionally, if the DSHS interpreter regulations were required by a consent decree relating to litigation to which the Department was not a party, the different treatment of DSHS claimants would be rationally related to the legitimate state interest in enforcing the consent decree.

## VI. *Wage Calculation*

¶56 We now turn to the merits of Kustura's challenge to the Department's wage calculation, which is the only wage rate order properly before us. He contends that the health care coverage amount included in his wage calculation was lower than the evidence demonstrated and should have included the employer's contribution for dental coverage, holiday pay, and the value of the employer contributions to government-mandated benefits.

¶57 RCW 51.08.178 governs the determination of compensation for time-loss and loss of earning power, which is based on monthly wages the worker was receiving at the time of the injury. The statute defines the term "wages" to "include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire."[75] Our courts have held that employer-paid health insurance premiums and holiday pay are "wages" to be included in the compensation

---

[73] *Dandridge v. Williams*, 397 U.S. 471, 486-87, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) (citation omitted).

[74] *See Moua*, 324 F. Supp. 2d at 1138 (noting that Equal Protection Clause ought not "dictate budget priorities by elevating language services over all other competing needs").

[75] RCW 51.08.178(1).

rate,[76] but employer payments for Social Security, Medicare, and Industrial insurance are not "wages" within the meaning of the statute.[77]

¶58 Kustura argues that dental coverage constitutes health care coverage that should be included in the wage calculation as a *Cockle* benefit. The Department does not address this contention, arguing only that substantial evidence supports the calculation in Kustura's case. We agree with Kustura. Dental coverage is simply a specific form of health coverage, and the basic health of workers necessarily encompasses their dental health. We hold that it must be included in the wage calculation as a health care benefit.

¶59 Kustura also argues that holiday pay should have been included in his wages and requests remand to require inclusion of this in the wage rate. But Kustura did not raise this issue before the Board, nor does he cite to any testimony or other evidence before the Board on this issue or indicate that the Board considered this issue.[78] Thus, this claim is not properly before us and we cannot consider it.

¶60 Kustura further asserts that employer contributions to government-mandated benefits, including Social Security, Medicare, Industrial insurance, and unemployment compensation should be included in the wage calculation. As discussed in the *Ferenćak v. Department of Labor & Industries*, 142 Wn. App. 727, 175 P.3d 1109 (2008) opinion, we have already determined in *Erakovic* that employer taxes for Social Security, Medicare, and Industrial insur-

---

[76] *Cockle*, 142 Wn.2d 801 (health insurance premiums); *Fred Meyer, Inc. v. Shearer*, 102 Wn. App. 336, 8 P.3d 310 (2000) (holiday pay), *review denied*, 143 Wn.2d 1003 (2001).

[77] *Erakovic v. Dep't of Labor & Indus.*, 132 Wn. App. 762, 134 P.3d 234 (2006); *see also Gallo v. Dep't of Labor & Indus.*, 155 Wn.2d 470, 120 P.3d 564 (2005) (employer contributions to retirement trust funds, apprenticeship training trust funds, and life insurance not "wages" for purposes of time-loss compensation calculations).

[78] RAP 2.5(a) and RCW 51.52.104 deem waived issues not raised in appeals to the Board. The relief Kustura sought in his appeal of the wage rate order was inclusion of health care benefits, other employer-paid insurance, pension benefits, and employer contributions to government-mandated benefits in his wage calculation.

ance are not part of the wage calculation. They are not consideration for services under the contract for hire, do not constitute other consideration of a like nature to wages, and are not critical to protecting the basic health and survival of the workers.[79] The same reasoning applies to unemployment benefits. The Board therefore properly excluded them from the wage calculation.

¶61 Finally, Kustura contends that the Department's wage determination was not supported by the evidence. Our review here " 'is limited to examination of the record to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the court's conclusions of law flow from the findings.' "[80] The Department included in Kustura's wage calculation $110.00 for employer-paid health care benefits. The chief executive officer of DBM testified that the employer contributed $110.00 per month to the union health and welfare benefits trust fund. An account executive from the administrator of the union trust fund testified that DBM paid $110.00 for Kustura's health and welfare benefits, but that the trust fund paid monthly premiums of $167.49 for medical coverage and $37.31 for dental coverage.

¶62 The amount to be included as the health care benefit is the amount the employer paid to the trust, not what the trust actually paid in premiums: the focus is on the payment for the benefit—not the entitlement to coverage—because it was the benefit being received at the time of injury.[81] Thus, the Department correctly included the employer contribution of $110, not the actual premium paid by

---

[79] *Ferenćak*, 142 Wn. App. at 740-41.

[80] *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 5, 977 P.2d 570 (1999) (quoting *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402, *review denied*, 130 Wn.2d 1009 (1996)).

[81] *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 761, 153 P.3d 839 (2007) (holding that amount employer paid to union health care trust fund must be included in wage calculation, rather than the amount of the coverage itself). Kustura argues that the amount should have been $208.60, but offers no citation to the record in support of this figure; he cites only to Fisher's testimony about the medical and dental premium amounts paid by the trust fund, which total $204.80.

the trust. Although it is not clear from the record whether this $110 included the contribution for dental coverage, the Board decision corrected the IAJ's proposed order on this issue, ruling that the IAJ's order improperly excluded dental coverage from the calculation. As we discussed above, dental coverage must be included in this calculation. Because it appears the Board's decision corrected the IAJ's error, no remand is necessary.

## VII. *Attorney Fees*

■ ¶63 Memišević requests attorney fees based on the superior court's correction of a Board finding that she was single with no dependents. She cites RCW 51.52.130, which provides for such fees if the outcome of the appeal is to reverse or modify the Board decision and "if the accident fund or medical aid fund is affected by the litigation." She argues that the superior court's correction of her marital status modified Department orders and affected the accident or medical aid fund because it resulted in an increase in worker benefits. She notes that as a married worker, she is entitled to a 65 percent benefit rate rather than a 60 percent benefit rate for unmarried workers.

¶64 While she is correct that the accident fund is affected when a court increases worker benefits,[82] she fails to demonstrate that the superior court order actually increased her benefits. As the court concluded, the Department's order determining her wage rate and amount of allowable benefits was final and binding,[83] and the trial court did not increase the amount of benefits determined by that order; it simply corrected her marital status.[84] The court's order does not suggest a remand or adjustment of

---

[82] *See Flanigan v. Dep't of Labor & Indus.*, 123 Wn.2d 418, 427-28, 869 P.2d 14 (1994).

[83] The court adopted the Board's conclusions of law that included a determination that the unappealed wage rate order was final and binding.

[84] The court's opinion simply states: "The Respondent has agreed that the record in the Memisevic case should be corrected to reflect that the claimant was

her benefits as a result of this correction.[85] Thus, she fails to demonstrate that the court's correction resulted in an increase in benefits, and we deny her request for attorney fees.

¶65 We affirm.

BAKER and DWYER, JJ., concur.

After modification, further reconsideration denied February 29, 2008.

Review granted at 165 Wn.2d 1001 (2008).

---

married at the time of her injury (as found in the unappealed, and therefore final, order of February 22, 2003)."

[85] The order states that the Board's findings "failed to include that the Department order of February 22, 2002 calculated her wage rate based on her status of married with no dependents," and changed the finding to state that the Department's February 22, 2002 order set time-loss compensation "and included health care insurance of $252.30, married with 0 dependents." (Emphasis omitted.) The order also states that the court found that she did not protest or appeal this order establishing the wage rate "and that plaintiff was married with no dependents." (Emphasis omitted.)